## Hanrahan v. John Hancock Mutual Life Insurance Company, Appellant.

Argued October 11, 1940.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, Rhodes and Hirt, JJ. Judgment

*Charles M. Willits*, with him *Ira Jewell Williams, Jr.*, and *Ira Jewell Williams*, of *Brown & Williams*, for appellant.

*David L. Ullman*, with him *Joseph Weinfeld*, for appellee.

Opinion by Cunningham, J., February 28, 1941:

Appellant has appealed from a judgment entered in the court below upon a verdict in favor of the appellee in the principal sum of $876, with interest, or a total of $1,099.40, following the denial of its motions for judgment in its favor, n. o. v., or a new trial. She sued as beneficiary of the Accidental Death Benefit Provisions of two policies of insurance—one for $416 and the other $460—issued upon the life of her husband, John Hanrahan, which policies were in full force on the date of his death, October 25, 1935. Appellant promptly paid appellee the face amount due under the main provisions of the policies and the controversy out of which this litigation arose relates exclusively to its liability for ad-

ditional sums "equal to the face amount of insurance," under provisions incorporated in each policy and reading:

"Accidental Death Benefit Provisions. Upon receipt of due proof that the Insured after attainment of age 15 and prior to the attainment of age 70, has sustained bodily injury, solely through external, violent and accidental means, occurring after the date of this Policy and resulting in the death of the Insured within ninety days . . . . . . the Company will pay in addition to any other sums due under this Policy . . . . . . an Accidental Death Benefit equal to the face amount of insurance stated in this Policy . . . . . . ."

As counsel for appellant press, upon this appeal, their motion for judgment upon the whole record, a somewhat detailed review of the evidence is required for its proper disposition.

It was not controverted at the trial that the insured, fifty-three years of age, whose regular employment was that of stevedore, but who had been temporarily engaged on a W. P. A. job, started to work from his home, 45 McKean Street, Philadelphia, before seven o'clock on the morning of October 24th, in good health; that shortly after eight o'clock he was admitted to the Episcopalian Hospital with a severe abrasion and bruise upon his left temple, his upper lip "bleeding and swollen," and with one of his upper front teeth "pushed in"; or that he had suffered a cerebral hemorrhage which was the immediate cause of his death on the evening of the following day.

There is also uncontradicted testimony upon this record that he sustained, on the morning of the 24th, certain bodily injuries, "solely through external, violent and accidental means." Mrs. Florence Walmsley, residing at 3506 N. Lawrence Street, near the point at which certain railroad tracks run under Fifth Street, testified she was standing at her kitchen window shortly after seven o'clock that morning and saw de-

cedent slip and fall down a steep and stony embankment extending from the level ground a distance of some eighteen feet to the tracks below. Her testimony continued: "I started over, and, just got half-way over and two men were waiting for the train on the other side of the tracks, and had crossed the tracks and picked Mr. Hanrahan up, and put him on the bank, and I asked him, 'Did you hurt yourself?' and he said, 'Oh, lady, I just fell down the bank and struck my head,' and I said, 'Well, I seen you,' and he said, 'Well, please get me to a hospital,' which I did."

The material allegations of the affidavit of defense were that decedent died "as a result of natural causes, to wit, heart disease and cerebral hemorrhage," and that the defendant company had "never been furnished with 'due proof' or with any proof whatsoever, that the insured sustained bodily injury, solely through external, violent and accidental means, resulting in [his] death."

To the averment relative to her alleged failure to furnish "due proof" appellee replied, in substance, that she had offered to submit, and in fact did submit, to appellant's representative due proof that her husband's death had resulted from the injuries sustained when he fell down the embankment in the manner above described.

Upon the question of a causal connection between the injuries sustained in the fall and decedent's death, it appeared from the proofs of death, produced at the trial by appellant and concerning which appellee was examined by her counsel (a part of which consisted of a certificate of death certified by the State Bureau of Vital Statistics); that the "Medical Certificate of Death," included therein, had been signed by the coroner of Philadelphia County and that the cause of death, therein stated, was "Hypertensive Cardio Vascular disease Cerebral hemorrhage." There was also evidence, hereinafter detailed, that the manager's office of the dis-

trict in which the policies had been issued and premiums collected had been informed in writing by appellee, a few days after the death of the insured, that the diag-- nosis made at the hospital was "Cerebral hemorrhage into ventricle."

To Dr. Leopold Vaccaro, called by appellee, a hypothetical question was propounded, which contained the material facts appearing from the testimony and concluded as follows: "Assuming those facts to be true, doctor, do you have an opinion as to whether or not the fall down the embankment which John Hanrahan suffered, and the blows to his head as evidenced by the bruise on the temple and the lip were the direct cause of the cerebral hemorrhage of which he died?" To this question the witness replied, "My professional opinion is, on the facts given, on the assumption given, rather, is that the death was directly and solely due to the accidental injury." In elaboration of his reply the witness explained: "Q. Doctor, just for the jury's sake, what is hypertensive cardiovascular disease? A. Hypertensive cardiovascular disease is part of a normal physiological process that takes place in all men or women of middle age. In other words, when we lose resiliency of muscles or agility or need to put spectacles on, that indicates there are certain processes taking place in our body which are normal at middle age, but abnormal at a previous age. Those constitute cardiovascular disease and any changes they [there?] would be absolutely normal, but would be abnormal in a younger age. In a man of twenty-three, it would constitute pathology, and in a man of fifty-three it would not. ...... Q. A hypertensive cardiac condition often induces cerebral hemorrhage, doesn't it? A. Not necessarily. ...... It is a perfectly normal condition. In this case we have a very distinct history of a fall, and if I am correct from reading that first exhibit, this man had an *intraventricular hemorrhage, which can*

*only be due and solely due to external violence which this man showed on his left face."* (Italics supplied.)

None of this expert evidence was controverted, and there is no competent evidence upon this record that the insured had any actual disease of the heart, as averred in the affidavit of defense. The evidence to which we have referred, if believed by a jury, would support a finding that the death of the insured resulted from bodily injuries sustained "solely through external, violent and accidental means," within the meaning of the insurance contracts.

The real contest centered around the issue whether or not appellee had presented "due proof" within the intendment of the provision, in support of her claim for the additional accidental death benefits. There was no requirement that the "proofs" be submitted in writing or in any particular form. The material evidence by and on behalf of appellee upon this branch of the case may be thus summarized:

Martin Cohen, who had collected the weekly premiums on these policies, testified (when called by appellee) he had been employed for ten years as an agent of appellant and when the death of an insured occurred his duties were to call on the beneficiary "and have proofs of death completed" by filling out the blanks furnished him by the company; that upon the day decedent's remains were brought from the hospital he called at the home and was shown the body by appellee, who directed his attention to the bruise on the temple and the injury to the lip; and that she told him decedent "had slipped and fallen down an embankment and hit his head." Excerpts from his testimony read: "Q. Did she tell you she was making a claim or intending to make a claim for double indemnity under these policies? A. She mentioned to me, asked me about a double indemnity, and she asked me if it was a double indemnity policy, and I said, 'Yes, if it was an accidental death they would pay double,' but I told her that was en-

tirely up to the coroner. ...... She told me that she—that her husband had been killed, and that she was enr titled to double indemnity, and she wanted to be paid double, and I told her that it was *entirely up to the coroner,* if the coroner said it was an accidental death then she would be paid double." (Italics supplied.)

Referring to a second occasion upon which he was called to decedent's home, during the day following the funeral, Cohen testified appellee showed him the "certified copy of the death certificate"; that he looked at it but "did not see anything on there about an accidental death"; and that when appellee insisted her husband's death had been accidental he "told her the best thing for her to do was to take it up with the district office" and when she asked him who the man in charge was he told her it was Mr. DeMay. A further extract from his testimony reads: "Q. On this second occasion when you were there the day after the funeral, did Mrs. Hanrahan say anything to you as to whether there were or were not any witnesses to this accident? A. Well, she had told me that she had witnesses that seen him fall, and that she had proof that her husband had been killed, and she couldn't understand why she wasn't called to the Inquest and the conversation about that."

Appellee's testimony relative to these interviews with Cohen did not differ materially from that given by him except that she stated she told Cohen where the accident happened—"up around Fifth and Tioga Streets" —and gave him the name of Mrs. Walmsley as a witness who had seen decedent fall, advising him this witness "lived at the back of the railroad there." In this connection it should be noted that the reference to the "coroner's certificate" is not to any formal finding by a coroner's jury; no transcript of the testimony or finding at the inquest was produced at the trial. It is evidently to the medical portion of the certificate of death filed by the local registrar in the Bureau of Vital Statistics of

the Pennsylvania Department of Health, which portion, as above stated, was signed by the coroner. He was not the attending physician and the introductory line reads: "I Hereby Certify, That I attended deceased from Inquest held, 19    to 10-31-1935." Apparently the words, "Inquest held," were written in the blank space intended for the insertion of the date when medical attendance began, and seem to indicate the inquest was held on October 31, 1935. The only other portion of the medical certificate of death filled out was that requiring a statement of "The cause of death," under which was filled in "Hypertensive Cardio Vascular disease Cerebral hemorrhage." Although the wounds upon the body indicated decedent had suffered violence of some kind, the portion of the certificate intended for a statement of the opinion of the attending physician or coroner as to whether the death was "accidental, suicidal or homicidal" was not filled out. Obviously, the cause of death set out in the certificate was not stated by the coroner from his personal knowledge; it was pure hearsay. Having been produced at the trial by appellant as part of the proofs of death, it was open to explanation and contradiction by appellee. See *Heffron, Admr. v. Prudential Ins. Co.*, 137 Pa. Superior Ct. 69, 74, 8 A. 2d 491.

Further uncontradicted testimony of the appellee was to the effect that within a few days after her second interview with Cohen she had prepared (evidently with some outside assistance) a letter addressed to appellant. After reciting the issuing of the policies, the death of the insured at the hospital under a diagnosis there made of "cerebral hemorrhage into ventricle," the letter continued:

"The case was referred to the coroner of the City of Philadelphia, who found death due to hypertensive vascular cardio disease, cerebral hemorrhage.

"Our own investigation reveals the fact that deceased suffered an accidental death, that is, while either ascend-

ing or descending steep incline deceased accidentally fell 25 feet down the incline striking his head upon a sharp hard substance agitating a heart and brain condition, causing death.

"The failure of the insurance company to pay the accidental death benefits and the acceptance of the face of the policy shall not preclude me from pursuing the accidental death benefits, provided for under the policy, by an action at law."

This letter was in the handwriting of appellee's son, John, and signed by her, but instead of mailing it, as originally intended, appellee and her son went to appellant's district office, at 7th and Chestnut Streets, during the week following the funeral, and handed the letter, together with the copy of the certificate from the bureau, to the Mr. DeMay to whom Cohen had referred her. Excerpts from her testimony read: "I said, 'My husband fell down the embankment' and told him (DeMay) about the bruises at the side of his face, and the lip, and when my husband left the house that morning he was well and in good health, and that I felt that the fall had killed him. Q. Did you tell him you were claiming for the double indemnity? A. Yes, I told him that my insurance policies called for double indemnity. . . . . . . What did he do with it (the letter) after he had read it? A. After he read it he handed it back to me. Q. What did he say when he handed it back to you, if anything? A. When he handed it back to me he said he couldn't do anything with that, as the coroner didn't call for accidental death. Then he asked me if I had an attorney. He said the best thing I could do would be to see an attorney, and that's how I come to see my attorney."

DeMay then filled out the proof of death produced by appellant at the trial, in which only the date of decedent's death, his residence, occupation and the relationship of the beneficiary were set forth, and attached to it the certificate handed him by appellee. He did

not take the stand to contradict any part of appellee's testimony and it is perfectly clear that the sole ground upon which appellant's representatives declined to accept the proof offered by appellee of the accidental death of her husband was the mere fact that the coroner had not affirmatively stated in the portion of the death certificate filled out by him that the insured's death had been "accidental." There is nothing upon this record indicating that appellant made any effort whatever to investigate for itself the circumstances under which its insured came to his death.

Appellee testified that after DeMay's refusal to accept the letter she retained Joseph S. Weinfeld, Esq., as her attorney. The only evidence offered by appellant was the identification by Mr. Weinfeld of a letter written by him under date of March 10, 1936, to appellant, advising that he represented appellee and stating: "Mr. Hanrahan died on the 25th of October, 1935. My client, Mrs. Hanrahan requested the opportunity to offer proof of the accidental death of John Hanrahan. Her desires were disregarded. Consequently, as her attorney, I am beginning an action at law against the John Hancock Mutual Life Insurance Company to enforce the contractual death indemnity benefits in the above mentioned policies." Mr. Weinfeld also identified appellant's reply under date of March 12, 1936, reading: "Your letter of March 10th received in regard to additional accidental death benefits under the above policies and would advise you that there was nothing in the proof to indicate that death was through accidental means, neither is there any evidence that the interested parties which [wish?] to make claim on these grounds. If you will furnish evidence of death through accidental means, same will be given consideration." The only reply to this letter was the institution of the suit on July 31, 1936.

Manifestly, the reason there was nothing in the proofs of death "to indicate that death was through accidental

means" was because the former proof referred to in the letter had been prepared by DeMay who, in so doing, had arbitrarily rejected appellee's written and insistent claim that her husband's death was accidental. It is difficult to escape the conclusion that if the dictates of fair business dealing had been observed by appellant's district office, DeMay would have, at least, attached appellee's letter to the proofs of death.

In the introductory portion of his charge the trial judge, GLASS, J., said to the jury: "You will have to determine first whether or not the death was accidental, whether he died as a result of the accident, whether the accident he had was the proximate cause of his death, or whether he died of natural causes. Secondly, it will be for you to determine from the evidence you have heard whether or not what was testified to insofar as notice or proof is concerned is true. If what has been testified to by the different witnesses—and I will give it to you in detail as well as I can, although the recollection of what was testified to is entirely for you —if you believe that testimony, then you would be justified in concluding that there was due proof of the death made to the defendant company."

The assignments of error are predicated upon the affirmance of certain points submitted in behalf of appellee, the refusal of appellant's point for binding instructions, and the denial of its subsequent motion for judgment in its favor n. o. v.

No specific complaint is made in any of the six assignments of the above instructions, but their correctness is challenged generally by the fourth, alleging error in the refusal to direct a verdict in favor of appellant. We have already indicated our conclusion that there is ample evidence upon the record to take the question whether or not the insured's death was accidental to the jury.

The main contention of counsel for appellant, as we gather it from their statement of the question involved

and from their brief, is that, even it be granted there was sufficient evidence to support a finding of an accidental death, within the meaning of the policies, the trial judge should have held, as a matter of law, that appellee had failed to show compliance with the condition precedent to recovery, i. e., had not adduced evidence of facts which, although believed by the jury, would amount to "due proof" of the accidental nature of her husband's death, and, upon that ground, should have directed a verdict in favor of appellant.

The three points for charge submitted in behalf of appellee, the affirmance of which is assigned for error in the first, second, and third assignments, may be thus summarized: The requirement of the policies that "due proof" be submitted that the insured "sustained bodily injury, solely through external, violent and accidental means, ...... resulting in [his] death" does not mean that the insurance company shall be the final judge of what is due proof. What it does mean is that the beneficiary shall submit proof, and whether or not it is sufficient to justify a recovery is a question for the trial judge. (*Janney v. Scranton Life Ins. Co.*, 315 Pa. 200, 207, 173 A. 819.) Compliance with the provision does not require any particular form of proof which the company may arbitrarily demand, or that it be in writing, but only such a statement of facts as, if established in court, would, prima facie, require payment.

Counsel for appellant cite in their brief a number of cases arising under policies providing for disability payments in which it has been uniformly held that the furnishing of proof of disability is a condition precedent to the recovery of benefits under the policy. The reason, as noted by our Supreme Court in *Courson v. New York Life Ins. Co.*, 295 Pa. 518, 522, 145 A. 530, is to enable the company to investigate before reaching and stating its conclusion upon the question of its liability. As stated in one of the cases cited in appellant's brief, due proof is not required to be furnished

in any particular form, nor is it required to be the strongest or best proof available, but it must be such as to give the insurer the essential facts upon which its liability depends and such as is credible, inducing belief in the truth of the facts stated. See also Couch Encyclopedia of Insurance Law, Volume 7, Section 1540, page 5491; Joyce Law of Insurance, Second Edition, Volume 5, Section 3290, p. 5494.

In our judgment, the points were properly affirmed.

This opinion need not be prolonged by a discussion of the question raised by counsel for appellant as to whether or not the information given, and proofs submitted to, Cohen and DeMay amounted to the tender of due proof to the company. Each policy contained the endorsement, "Read Your Policy Carefully. In case of any question, in order to insure prompt attention, notify at once the Superintendent of the District where the premiums are being collected." Under the uncontradicted evidence appellee promptly went, at the suggestion of Cohen and in compliance with the above instruction, to the office designated by the company and there gave DeMay a written statement of the manner in which her husband had sustained his fatal accidental injuries and demanded the double indemnity provided in the policies.

The contention in behalf of appellant upon this phase of the case is clearly and definitely ruled against it by the opinion of Mr. Justice Linn, speaking for the Supreme Court, in *Astrin v. Metropolitan Life Insurance Company*, 341 Pa. 120, 17 A. 2d 887. In that case the policy insured against total and permanent disability; a notice similar to the one above quoted was endorsed upon it; information of disability and demand for payment of benefits was given and made orally to and upon local agents of the company occupying positions similar to those held by Cohen and DeMay in the case at bar; they rejected the claim because the assistant district manager thought it was not compensable. One of the

issues at the trial was whether the insured complied with the requirement of "due proof" of the fact of disability. The court below held he had not, declined to hear evidence on the other issues, and directed a verdict for the company.

In reversing, the Supreme Court cited a number of cases, including our case of *Amrovcik v. Metropolitan Life Insurance Company*, 119 Pa. Superior Ct. 176, 184, 180 A. 727, and held the presentation of proof of the nature of that tendered in the present case to such representatives of the insurer as Cohen and DeMay was a sufficient performance of the condition precedent to recovery.

This appellant had ample notice and opportunity to make any investigation it desired. It had notice upon the face of the certificate of death, delivered by appellee to its district office and forwarded by DeMay to its Home Office, that a coroner's inquest had been held. The record of that proceeding was, of course, open to such inspection as the company might see fit to make.

Another feature of this case, also present in the Astrin case, which must be kept in mind is that the proofs submitted by appellee were not rejected by DeMay because of any lack of detail or informality in them, but solely because the coroner in filling out the medical certificate of death had not affirmatively expressed thereon his opinion that the insured's death was accidental. The proffered proofs having been rejected upon that ground alone, appellant is not entitled to now assert, as it does in its brief, that appellee should not be permitted to recover because of her failure to furnish detailed, specific and written proof.

We are not impressed with appellant's complaint of the failure of appellee's counsel to comply with the suggestion contained in its letter to him of March 12, 1936, that if he would "furnish evidence of death through accidental means," the same would be given consideration. So long as appellant stood upon its proposition

that it would not pay the double indemnity unless and until appellee produced a certificate from the coroner that her husband's death had been accidental, the submission of any additional proof by appellee would have been futile. That position was untenable; such a certificate would not be binding upon either party.

Although the testimony with relation to the submission of proof was uncontradicted, and must be read in the light most favorable to appellee, the credibility of the witnesses was for the jury; that question was properly submitted to that tribunal with the instruction that if they believed the testimony they would be justified in concluding the "due proof" required by the policies had been submitted to the company; the verdict shows the jury did believe it and, in our opinion, the court below was fully justified in denying appellant's motion for judgment in its favor upon the whole record.

Attention has been called by appellant to the recent opinion of our Supreme Court (filed January 6, 1941,) in the case of *The Real Estate Trust Company of Philadelphia, Trustee, etc. v. Metropolitan Life Insurance Company*, 340 Pa. 533, 17 A. 2d 416. We are unable to see that the case cited is of any assistance to the present appellant. The policies here involved did not contain any additional "disease and infirmity" clause and there was no evidence in the present case from which it could be found that the preexisting condition of the insured's health was anything more than a passive one, incidental to his age; nor was there anything in the charge of the trial judge placing any burden of proof upon appellant to show that the death of the insured was due to a preexisting infirmity. Moreover, the contention, set forth in the affidavit of defense and asserted at the trial to the effect that the insured died as a result of natural causes, was abandoned upon the appeal to this court. The opening paragraph of appellant's brief reads: "The sole question to be decided is, did the plaintiff furnish, and the insurer

receive, *due proof* that the insured sustained bodily injury, solely through external, violent and accidental means resulting in his death?"

The assignments are severally overruled.

Judgment affirmed.