460 A.2d 1127

**COMMONWEALTH of Pennsylvania**

v.

**Donna POTTS, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**Frank COCCHIARA, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 11, 1983.

Filed April 29, 1983.

258

Rochelle S. Friedman, Pittsburgh, for Potts, appellant at No. 1228.

Carl Max Janavitz, Pittsburgh, for Cocchiara, appellant at No. 1229.

Kemal A. Mericli, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before POPOVICH, MONTGOMERY and VAN der VOORT, JJ.

POPOVICH, Judge:

■ After a trial by jury, appellant, Donna Potts, was found guilty of Prostitution (18 Pa.C.S.A. § 5902(a)(1)) and Criminal Conspiracy (18 Pa.C.S.A. § 903(a)(1)).[1] Following the denial of post-trial motions, appellant's sentence on the Prostitution conviction was suspended, but she was placed on probation for one (1) year for her Criminal Conspiracy conviction. This appeal followed. We affirm.

The facts, viewed in a light most favorable to the Commonwealth, consist of the following: Because of information received from a confidential informant, Detective James Toler, of the vice control division of the Pittsburgh

---

1. It needs to be mentioned that appellant's co-defendant, Frank Cocchiara, also was convicted at the same trial of Promoting Prostitution (18 Pa.C.S.A. § 5902(b)(1)) and Criminal Conspiracy (18 Pa.C.S.A. § 903(a)(1)). His appeal from the judgment of sentence is somewhat more involved. That is, initially, Cocchiara was sentenced on December 4, 1980, and a timely appeal was filed with the prothonotary of this Court and docketed at *No. 1229 Pittsburgh, 1980.* However, pursuant to Cocchiara's counsel's Petition For Modification Of Sentence, the trial court entered an Order dated December 26, 1980 which read:

"IT IS HEREBY ORDERED that the sentence imposed December 4, 1980, be vacated and that a hearing on the said Petition for Modification of Sentence be held on Wednesday, January 7, 1981 ...." (Record No. 15)

At the January 7th hearing, Cocchiara's December 4, 1980 sentence was "amended" so that instead of serving his 3- to 6-month prison term for promoting prostitution by continuous confinement in jail, he could complete his sentence on Fridays through Sundays from 8:00 AM until 4:00 PM in the county jail. Also, Cocchiara was to serve as a psychiatric aid in the prison. The sentence for the conspiracy conviction remained the same, i.e., a $1,000 fine and three (3) years probation to take effect after Cocchiara had completed his initial sentence for promoting prostitution. As before, an appeal was filed; this time it was from the January 7, 1981 judgment of sentence and the prothonotary of this Court docketed the case at *No. 152 Pittsburgh, 1981.* However, by Order dated February 14, 1983, this Court granted Cocchiara's "Petition For Withdrawal" of the case docketed at *No. 152 Pittsburgh, 1981.*

Since the appeal at *No. 1229 Pittsburgh, 1980* was rendered moot by the lower court vacating the judgment of sentence upon which it was based, *see Commonwealth v. Corson,* 298 Pa.Super. 51, 444 A.2d 170 (1982); Pa.R.Crim.P. 1410, and because Cocchiara's subsequent appeal at *No. 152 Pittsburgh, 1981* was withdrawn, Cocchiara has presently *no* appeal pending before this Court.

police, was directed to an advertisement appearing in the May 5, 1979 edition of *The Pittsburgh Press.* The ad read: "Companions for all occasions. We come directly to your door. Senior citizens, veterans, and invalids welcome. Call 261–0931." (N.T. 22). As a result of this publication, on May 9, 1979 Detective Toler phoned the number listed in the paper from Room 290 of the Viking Motel, situated at 1150 Banksville Road, Pittsburgh. The detective told the male on the other end of the line that his name was "Carl Rosenberger," that he was staying at Room 290 of the Viking Motel and that he was looking for a young girl, about twenty-five years of age. (N.T. 239–240) After 2 or 3 minutes, Detective Toler was called back by the Escort Service and the male he had just spoken to said he was checking to make sure that he ("Carl Rosenberger") was in the room. Within 45 minutes of the initial call, a female knocked on Detective Toler's door. The detective identified himself as "Carl Rosenberger" and said to the girl, "You must be Marsha." To which she responded, "Yes" and walked into the room. The detective talked to the girl about price. That is, he told her he wanted to have sexual intercourse, and the first price mentioned was seventy dollars for the Escort Service. The second price was forty-to-fifty dollars for the girl's tips. (N.T. 243) However, when the detective was unable to produce his wallet for the female's inspection, she left.

The next time Detective Toler had occasion to phone the number listed in *The Pittsburgh Press* was on May 16, 1979. Detective Toler again called the number from the Viking Motel; however, this time it was from Room 126. Toler told the male on the other end of the phone that he "was Walter Stevens, [he] was staying at the Viking Motel, Room 126. And [he] asked the unknown male on the other end of the phone what was—what was the going rates." (N.T. 30) Toler also told the listener that he "wanted a tall woman with black hair, around thirty years old." (N.T. 31) To this inquiry, Toler received a satisfactory response. The call was made at about 9:30 p.m.

On the evening in question, at approximately 10:00 p.m., appellant knocked on Detective Toler's door and asked him if he was "Walter Stevens." Toler answered, "Yes." The appellant then asked for and received Toler's wallet. She said she wanted to check his "ID." After appellant was satisfied that the person she was dealing with was the individual whose name appeared on the cards in the wallet, "she gave [the detective] a piece of paper to fill out [his] name and address and [his] signature." (N.T. 34) Also, on this "form," he was to list his age, height, weight, social security number and driver's or operator's plate number. After supplying the information sought, Detective Toler asked appellant what he would get for his money and she replied, "It will cost seventy dollars for the escort service." (N.T. 36) Following the detective's response of, "Well, okay," Miss Potts stated that she would have to check in. Miss Potts dialed the phone, read the name of "Walter Stevens" off and that he had stated to her that he was from Altoona. The detective testified that he did not see the number dialed by the appellant, nor could he say with whom appellant was conversing.

When Miss Potts was done with the phone and the detective inquired, "What else do I get for my money?" she responded that for another seventy dollars he would get whatever he wanted. The detective informed the girl that he desired to engage in oral sodomy, to which Miss Potts said, "Okay." At this stage of the discussion, Detective Toler handed Miss Potts one hundred and fifty dollars. Miss Potts placed the money in her purse and gave the detective ten dollars in change. Thereafter, Miss Potts motioned to the detective to remove his clothing. After the two were naked, the appellant had sat up on the bed with her back against the head board, the detective revealed his true identity and placed appellant under arrest. Subsequently, Toler searched appellant's purse to remove the money he had paid her. In doing so, the detective retrieved two slips of paper. One slip was a carbon copy of the other which he had filled out earlier under the alias of "Walter

Stevens." Also, in the purse, the detective discovered a pocket paging device, but, not knowing what it was at the time, returned it to the appellant. Appellant was, thereafter, advised of her *Miranda* rights and transported to the Public Safety Building in Pittsburgh. Once there, Miss Potts wanted to make a phone call. Detective Toler stated, "Well ... we will go over to the Union Trust Building to search for Frank Cocchiara." Hearing this, appellant appeared surprised and asked the detective, "How do you know him?" (N.T. 98) The detective did not answer.

It so happened that on the day appellant was arrested (May 16, 1979), the police had secured a warrant to search Room 980–A of the Union Trust Building in Pittsburgh. The warrant was executed after the appellant's arrest, at approximately 11:00 p.m. The police knocked on the office door and identified themselves. After waiting for about a minute and a-half without any response from within, the police entered the premises by means of a pass key obtained from the security guard and found Frank Cocchiara, appellant's co-defendant, in the office. The police supplied Cocchiara with a copy of the warrant prior to commencing a search of the premises. As a result of the search of Room 980–A of the Union Trust Building, the police confiscated the following evidence:

1) A piece of paper (Commonwealth's Exhibit No. 5) that was taped to the side of the air-conditioner. The paper had "about thirty male names on [it], and on the top right hand [side] it ha[d] 'Carl Rosenberger.'" (N.T. 247) "And on the top of that it ha[d] 'V-i-k' and an arrow pointing to the name 'Carl Rosenberger.'" (N.T. 248)

2) A phone directory (Commonwealth's Exhibit No. 8) that had four slips of paper in it. One of the slips had written on it "Walter Stevens, 126" and the letters "V-i-k". (N.T. 236)

3) Four slips of paper (Commonwealth's Exhibit No. 9) that were *exactly* "the same kind as the ones [Detective Toler] got off Miss Potts." (N.T. 234) That is,

they had the same fine printing on them and each requested the same type of information from the applicant as was sought from Detective Toler.

4) A photostatic copy of a freehand sketch of an Escorts Plus form. "It ha[d] a phone number '261–0930' and '261–0931, Escorts Plus, male, female, full service.'" And farther down the sheet was another sketch that read: "'Full service, Escorts Plus, male, female.' And it ha[d] a phone number, '261–0930, 261–0931.'" (N.T. 232)

Additionally, Detective Edward Conley, one of the officers who accompanied Detective Toler in the execution of the warrant, testified that, during the search, he called headquarters and had someone there dial "261–0391"—this number was the one that appeared in the newspaper ad—to see if the phone in Cocchiara's office would ring. Shortly after making the request, the phone rang and the caller was from police headquarters. Furthermore, Detective Conley recalled answering the phone a total of three times while in Cocchiara's office. On two occasions a female voice asked for "Frank" and the last call was from a male caller "want[ing] to know if there were any female escorts available." (N.T. 150)

It is interesting to observe that Detective Conley, in recounting the circumstances surrounding Donna Potts' arrest, recalled "notic[ing] a little black thing .... It looked like a transistor or something[ ]" fall out of appellant's purse when it was emptied onto the bed at the Viking Motel. Detective Conley was on duty with Detective Toler at the Viking Motel. Moreover, Detective Toler also testified to finding a white envelope for beepers—electronic paging devices—that "had the name 'Donna'" on it in Cocchiara's office in the Union Trust Building. (N.T. 76)

Norman Rockwell, the manager of the Union Trust Building, was called by the Commonwealth to establish the fact that Cocchiara entered into a lease for Room 980–A on April 4, 1979 under the name of "Second Part, Inc., doing business as Escorts Plus." (N.T. 108)

As is relevant to the case at bar, we note that at trial the Commonwealth produced the testimony of a Charles Henshaw, sales manager for Airsignal International of Pittsburgh, Inc., a company involved in the leasing of pocket paging devices ("beepers").

While on the stand, Mr. Henshaw stated that on April 12, 1979 he leased three beepers to Frank Cocchiara. The numbers were "227–9172, –82 and –92". (N.T. 200) He went on to state that each beeper has its own private telephone number, and that these numbers are purchased through the Bell System in blocks of one hundred so as to avoid any confusion with a public subscriber to a telephone. The witness also recalled that the model leased by Cocchiara had the capacity ("range") to make them useful anywhere in the Allegheny County area.

After the completion of the Commonwealth's case, the jury was instructed as to the law to apply in reaching its verdict. Following the jury's verdict finding the appellant and co-defendant Frank Cocchiara guilty as charged, post-trial motions were denied and sentence was imposed. This appeal followed. As stated previously, this appeal is concerned solely with the claims proffered by the appellant, Donna Potts, and not Frank Cocchiara. *See* note 1, *supra.*

On appeal, appellant avers [2] that: 1) the Prostitution statute is unconstitutional; 2) the trial court erred in not

2. Appellant's, Donna Potts', brief to this Court appears to be the by-product of a joint effort on the part of appellant's and co-defendant Cocchiara's counsel, both of whom are members of the same law firm. We bring this point out, inasmuch as in the "Argument II" section of the brief the *only* party attacking the sufficiency of the evidence in the context of the trial court erring in not granting a demurrer at the end of the Commonwealth's case is co-defendant Cocchiara. (*See* Appellant's Brief at 11–13) Thus, since appellant's name appears nowhere in this portion of the brief concerning the purported trial court error, we need not address the sufficiency of the evidence question since it is not advanced by the appellant Donna Potts. *See Sheppard v. Old Heritage Mutual Insurance Co.,* 492 Pa. 581, 425 A.2d 304 (1980) (failure to pursue an issue on appeal is just as effective a waiver as is the failure to initially raise the issue); *Kubert v. Fidelity Bank,* 245 Pa.Super. 60, 369 A.2d 293 (1976) (failure of appellant to allege in his brief to appellate court that lower court

granting a mistrial; 3) the trial court erred in regard to certain evidentiary rulings; 4) the trial court erred in denying certain requested points for charge; and 5) the trial court erred in refusing a motion for a directed verdict of acquittal.

Appellant's first argument concerns the constitutionality of subsection (a) of Section 5902, which reads:

"**(a) Prostitution.**—A person is guilty of prostitution; a misdemeanor of the third degree, if he or she: (1) is an inmate of a house of prostitution or otherwise engages in sexual activity as a business;"

18 Pa.C.S.A. § 5902(a)(1).

In particular, appellant asserts that the statute is unconstitutionally vague and overbroad, and, therefore, violates the right to due process of law guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States of America because the terms "sexual activity" and "business" are inadequately defined.

■ The void-for-vagueness doctrine, as extensively developed by the United States Supreme Court, is a due process doctrine incorporating notions of fair notice and warning. *Smith v. Goguen*, 415 U.S. 566, 572, 94 S.Ct. 1242, 1246, 39 L.Ed.2d 605 (1974).

■ In determining the sufficiency of the notice, a statute must of necessity be examined in light of the conduct with which the accused is charged. *Parker v. Levy*, 417 U.S. 733, 757, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439, 458 (1974); *Commonwealth v. Hughes*, 468 Pa. 502, 364 A.2d 306 (1976); *Commonwealth v. Dodge*, 287 Pa.Super. 148, 429 A.2d 1143 (1981). In compliance thereto, this Court finds that Potts was charged with, and found guilty of, "engag[ing] in sexual activity as a business in violation of

erred by denying his claim that bank had violated his constitutional right to travel constituted a waiver of such an issue); *Hanrahan v. John Hancock Mutual Life Insurance Co.*, 143 Pa.Super. 557, 18 A.2d 512 (1941); *see generally Commonwealth v. Dalahan*, 262 Pa. 615, 396 A.2d 1340 (1979).

Section 5902(a)(1) of the Pennsylvania Crimes Code, Act of December 6, 1972, 18 Pa.C.S. § 5902(a)(1)." [3] (*See* "Criminal Action No: CC 7903596A," at page 1) "Sexual activity" is defined in subsection (f) of the same section to "include[ ] homosexual and other deviate sexual relations."

Potts contends that the absence of a more concise definition for "sexual activity" and "business" leaves the police, magistrate and ordinary citizen in a quandary as to the conduct proscribed. (Appellant's Brief at 9) On this point, the United States Supreme Court has stated, in rejecting the contention that a statute prohibiting a "crime against nature" was unconstitutionally vague in *Rose v. Locke,* 423 U.S. 48, 49–50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185, 188 (1975), that:

> "It is settled that the fair-warning requirement embodied in the Due Process Clause prohibits the States from holding an individual 'criminally responsible for conduct which he could not reasonably understand to be proscribed.' But this prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.' Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. All the Due Process Clause requires is that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden." (Citations omitted) (Footnote omitted) *See also Commonwealth v. Hughes, supra; Commonwealth v. Baggs,* 258 Pa.Super. 133, 139, 392 A.2d 720, 723 (1978); *People v. Superior Court of Alameda County,* 19 Cal.3d 338, 138 Cal.Rptr. 66, 68–69, 562 P.2d

**3.** Only two states have identical statutes, yet the constitutionality of neither has been ruled upon. *See* New Jersey: N.J.S.A. 2C:34–1 (1982); North Dakota: N.D.Century Code Ann. § 12.1–29–03 (1976).

1315 (1977); *Commonwealth v. Israeloff,* 8 D. & C.3d 5, 11–12 (1978).

The same high Court:

"... has consistently held that lack of precision is not itself offensive to the requirements of due process. '... [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by *common understanding and practices....*'" (Emphasis added) *Roth v. United States,* 354 U.S. 476, 491, 77 S.Ct. 1304, 1312, 1 L.Ed.2d 1498 (1957), *quoting United States v. Petrillo,* 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877, 1883 (1947); *see also District of Columbia v. Garcia,* D.C.App., 335 A.2d 217, *cert. denied,* 423 U.S. 894, 96 S.Ct. 192, 46 L.Ed.2d 125 (1975).

To discern the "common understanding and practice" attributed to the present Prostitution statute necessitates tracing its development. *See Regents of University of California v. Bakke,* 438 U.S. 265, 284, 98 S.Ct. 2733, 2745, 57 L.Ed.2d 750 (1979).

In *Commonwealth v. Lavery,* 247 Pa. 139, 142, 93 A. 276 (1915), our Supreme Court said that prostitution was "not mere fornication or adultery confined to one man, but indiscriminate illicit intercourse for hire with any man seeking it," but in *Commonwealth v. Stingel,* 156 Pa.Super. 359, 361, 40 A.2d 140, 141 (1944), this Court held that "indiscriminate cohabitation" was no longer necessary, since "the Legislature ha[d] broadened the compass of the term" by the Act of June 24, 1939, P.L. 872, § 103; 18 P.S. § 4103. "Prostitution" was there defined as "the offering or using of the body for sexual intercourse for hire." Also, in this Commonwealth's statutes (e.g., the Act of June 30, 1923, P.L. 982 and the Act of June 24, 1939, P.L. 872), the word "fornication" was dropped from the language of the sections relating to similar offenses. *Commonwealth v. Robertson,* 178 Pa.Super. 281, 286, 116 A.2d 224, 227 (1955); *Commonwealth v. Dougan,* 5 D. & C.3d 406, 408 (1978).

■ In the present Act [18 Pa.C.S.A. § 5902], the Legislature did not eradicate the commonly understood definition of "prostitution" but merely clarified it to include "homosexual and other deviate sexual relations." *Id.; see Commonwealth v. Miller,* 469 Pa. 24, 28, 364 A.2d 886, 887 (1976).

■ It cannot be gainsaid that "prostitution" has persisted since biblical times, and, as such, has acquired a traditional meaning, i.e., "indiscriminate illicit intercourse for hire." *See Commonwealth v. Lavery, supra; People v. Costello,* 90 Misc.2d 431, 433, 395 N.Y.S.2d 139 (1977); *Commonwealth v. King,* 374 Mass. 5, 372 N.E.2d 196, 201–202 (Mass.1977); *Commonwealth v. Israeloff, supra.*

■ As for the meaning of "business," Black's Law Dictionary [4] (Rev. 5th Ed.1979), p. 302, defines it as:

"Employment, occupation, profession, or *commercial activity engaged in for gain* or livelihood. Activity or enterprise for gain, benefit, advantage or livelihood...." (Emphasis added)

■ Taking into account the facts presented at trial and recounted *supra,* we find that the jury could have reasonably inferred that Potts was involved in a "commercial activity engaged in for gain." To find to the contrary would be an aberration of the facts. Additionally, this Court concludes that "sexual activity," when interpreted according to its fair import, *Commonwealth v. Skufca,* 475 Pa. 124, 321 A.2d 889 (1974); *Commonwealth v. Israeloff, supra;* 1 Pa.C.S.A. § 1903; 18 Pa.C.S.A. § 105, encompasses an agreement to perform, for hire, "sexual intercourse and fellatio"—the activity which Potts consented to perform for the paid-in-advance consideration of $140.00.[5] Such

---

**4.** One is permitted to utilize legal dictionaries, treatises and judicial opinions to interpret language in statutes. *Rose v. Locke, supra; Commonwealth v. King, supra.*

**5.** This type of activity is considered unlawful even if carried out in private. *See* Comment to Section 251.2(1) of the Proposed Official Draft of the Model Penal Code—Pennsylvania's statute on prostitution is modeled after this.

conduct falls squarely within the traditional understanding of the term "prostitution." Therefore, appellant cannot successfully maintain that Section 5902(a)(1) is unconstitutionally vague on its face. *See Coates v. Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 2111 (1971); *Commonwealth v. Dodge, supra; Commonwealth v. King, supra.*

 Appellant has advanced many hypothetical situations [6] to this Court in an attempt to raise the spectre of citizens unknowingly engaging in behavior which might arguably be prohibited by the statute. It is sufficient to remark that:

> "... even if a statute is imprecise, a person who is given fair warning that his conduct is criminal in nature has no standing to complain that other persons who engage in a different course of conduct may not constitutionally be prosecuted under that statute." (Citation omitted) *United States v. Pray*, 452 F.Supp. 788, 796 (M.D.Pa.1978); *Summers v. Anchorage*, 589 P.2d 863, 868 (Alaska, 1979).

 Moreover, this Court wishes to make it clear that the statute in question is not broad enough to proscribe noncommercial sexual activity, such as the exchange of sexual acts as a part of social companionship. Nor is it a vague attempt to regulate sexual conduct in general. *See* Comment to Section 251.2(1) of the Proposed Official Draft of the Model Penal Code, p. 236.

 In regard to appellant's argument that Section 5902(a)(1) is overbroad, this Court, in order to agree that such an assertion has merit, must find that the statute in question:

> If an offer standing alone were not prohibited conduct, the police could not be complainants in prostitution cases unless they first actually performed acts of intercourse with the person they were arresting—a practice which no doubt would create a great deal of marital dissatisfaction and public criticism. *People v. Johnson*, 60 Ill.App. 183, 17 Ill.Dec. 382, 386, 376 N.E.2d 381, 385 (1978).

**6.** *See* Appellant's Brief at 9.

"... offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' " (Citations omitted) *Zwickler v. Koota,* 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444, 451 (1967); *see also Commonwealth v. DeFrancesco,* 481 Pa. 595, 393 A.2d 321 (1978).

■■■ Suffice it to say that this Court does not view the statute to be so amorphous that it has the traditional trappings of a vague statute which attempts to regulate sexual acts which result, for whatever motives, from ordinary social situations. Instead, this Court sees it as providing an ascertainable standard of conduct directed at a defined evil (commercial exploitation of sexual gratification) and is not so vague as to inhibit the exercise of constitutionally protected freedoms so as to be overbroad.

As for appellant's second averment, the matter concerns Detective Toler's response to the Assistant District Attorney's series of questions, i.e.:

"[Assistant District Attorney:]

Q Did th[e female that knocked on the door of the Viking Motel on May 16, 1979] identify herself?

[Detective Toler:]

A She asked me if I was Walter Stevens, and I said 'Yes.' I said 'You're Donna?' She said, 'Yes.' I said, 'Come on in.'

Q Did you know her last name at the time?

A Yes, sir.

Q How did you know her last name?

MISS FRIEDMAN [Appellant's Counsel]: Objection.
THE COURT: Objection sustained.

\* \* \* : \* \*

MR. JANAVITZ [Appellant's co-defendant's counsel]: I move for a mistrial on the basis of the response to the question.

MISS FRIEDMAN: I would concur in that motion."

274

(N.T. 92 & 93)

After both counsels for the defense moved for a mistrial, the trial court denied the request.

 Under the law of this Commonwealth:

" 'To warrant a characterization as prejudicial the testimony must convey to the jury, either expressly or by reasonable implication, the fact of a prior criminal offense.' " (Emphasis added) *Commonwealth v. Starks,* 484 Pa. 399, 408, 399 A.2d 353, 357 (1979), *quoting Commonwealth v. Riggins,* 478 Pa. 222, 386 A.2d 520 (1978) *see generally Commonwealth v. Williams,* 476 Pa. 557, 383 A.2d 503 (1978); *Commonwealth v. Hall,* 264 Pa.Super. 261, 399 A.2d 767 (1979).

Additionally, in reviewing a trial court's decision not to declare a mistrial, an appellate court should not reverse "absent a flagrant abuse of discretion." (Citations omitted) *Commonwealth v. Conti,* 236 Pa.Super. 488, 495, 345 A.2d 238, 242 (1975).

 In making our determination that the trial court did not err in denying appellant's motion for a mistrial, we are guided by this Court's holding in *Commonwealth v. Griffin,* 236 Pa.Super. 344, 344 A.2d 517 (1975), *allocatur* denied on December 19, 1975. In *Griffin,* a police officer, in response to a question by the district attorney as to whether he knew the accused, stated that he was "acquaint[ed] with him professionally." *Id.,* 236 Pa.Superior at 345, 344 A.2d at 518. Judge Van der Voort, writing for the court en banc, and relying upon our Supreme Court's decision in *Commonwealth v. Allen,* 448 Pa. 177, 292 A.2d 373 (1972), "f[ound] that the officer's statement, even when considered *alone,* d[id] not create the prohibited implications." (Emphasis in original) *Ibid.* Since we find the facts in *Griffin* to be indistinguishable from the ones in the case at bar, we hold, as did the Court in *Griffin,* that the officer's response was not so prejudicial as to convey to the jury that Potts was guilty of involvement in prior criminal activity. "Furthermore, nothing in the Officer's testimony suggested that the way he knew the defendant was a result

of a prior arrest or conviction. Merely because a police officer knows someone or knows where they may be found does not suggest that the person has been engaged in prior criminal activity. A policeman may know someone because they reside in the same neighborhood or for any other number of reasons. We refuse to hold that a policeman's statement to the effect that he knew someone ... raises an inference of prior criminal activity. Any such holding would defy all logic and good sense." *Commonwealth v. Sanders*, 296 Pa.Super. 376, 379, 442 A.2d 817, 818 (1982). Thus, we hold that the trial court was not guilty of committing reversible error in denying appellant's motion for a mistrial.

The third point *preserved* by appellant for our review centers around an evidentiary ruling by the trial court in admitting into evidence the testimony of Charles Henshaw concerning "beepers," which appellant states was error "since it was not relevant, was immaterial to the issues involved and utterly without foundation." (Appellant's Brief at 17)

To start with, a judge has broad discretion as to the manner in which a trial is to be conducted, particularly with regard to the admission or exclusion of evidence. *Commonwealth v. Niemetz*, 282 Pa.Super. 431, 422 A.2d 1369 (1981).

Upon an examination of the applicable rules of evidence, one finds that a basic requisite for the admissibility of any evidence in a criminal case is that it be competent and relevant. *Commonwealth v. Batty*, 482 Pa. 173, 393 A.2d 435 (1978); 1 Wharton's Criminal Evidence § 151 at 274 (1972). Since appellant does not assail the competency of Mr. Henshaw to testify on the subject of electronic paging devices, we need to determine if such testimony, as it relates to Cocchiara's purchase of the device from Henshaw, was relevant to advancing the Commonwealth's case against the appellant.

"Relevance," although not precisely and universally defined by the law, 31A C.J.S. Evidence § 158 at 431 (1964), has been repeatedly held by the Pennsylvania courts to be evidence which "tends to increase or decrease the probability of a material fact" in issue. *Commonwealth v. Chism*, 480 Pa. 233, 246, 389 A.2d 1041, 1048 (1978). Stated another way, any legal evidence is admissible if, and only if, it logically or reasonably tends to prove or disprove a material fact in issue, or to make such a fact more or less probable, or if it affords the basis of a logical or reasonable inference or presumption as to the existence of a material fact in issue. 31A C.J.S. Evidence § 600 at 389 (1964); *Commonwealth v. Diggs*, 260 Pa.Super. 349, 356–57, 394 A.2d 586, 590 (1978), *citing* McCormick on Evidence § 185 at 437–438 (2nd Ed.1972). Based on such a standard, we find that Mr. Henshaw's testimony was a link in the chain of events establishing a nexus between appellant and Cocchiara in the operation of a prostitution service. For example, there was some evidence to indicate that the appellant was in possession of an electronic device on the evening of her arrest at the Viking Motel, and an envelope for "beepers," with the name "Donna" written on its face, was seized by police from Cocchiara's office within a half-hour of her arrest. Further, appellant, while at the Public Safety Building following her arrest, acknowledged being aware of the identity and existence of Frank Cocchiara when Detective Toller indicated, in passing, that he was about to search the Union Trust Building for Cocchiara. (N.T. 98) Therefore, we conclude that the trial court committed no error in permitting Mr. Henshaw to testify to the leasing agreement entered into between himself and Cocchiara for three "beepers." Since the relevancy of such testimony was established, it was for the jury to decide what weight, if any, was to be given thereto.

Appellant's fourth argument alleges error on the part of the trial court in refusing to charge the jury that "in Pennsylvania consenting adults may fornicate legally[.]" We shall not dwell on this matter for long because appellant

was charged with engaging in sexual activity as a business, which, as decided *supra,* requires proof that the accused did so "for gain." There is thus no need to place before the jury the question of whether the complained of conduct was entered into *consensually.* Thus, to have acceded to appellant's required point for charge, given the particular facts instantly, would have resulted in charging on law applicable to no facts in the case. *See Brancato v. Kroger,* 312 Pa.Super. 448, 458 A.2d 1377 (1983); *Frank v. Peckich,* 257 Pa.Super. 561, 391 A.2d 624 (1978).

■■■ Appellant's fifth argument also deals with the commission of a purported error in the trial court's refusal to charge on a requested point. In particular, appellant urges that the jury should have been informed "that one transaction does not necessarily constitute a business," so as to constitute a violation of the Prostitution statute.

This Court has had the occasion, recently, to define the term "business" as it applies to violations of Section 5902(a)(1). *Commonwealth v. Danko,* 281 Pa.Super. 97, 421 A.2d 1165 (1980). In *Danko,* in deciding what evidence would be sufficient to demonstrate beyond a reasonable doubt that an accused was engaging in sexual activity as a business, we stated:

> "The evidence that appellant offered to engage in specific sexual acts for a price, used words commonly used by prostitutes to describe those acts, accepted the money offered for one of those acts, and undressed in preparation for it, was sufficient to prove that [the accused] was then engaging 'in sexual activity as a business.' There is no need for the officer to participate in the sexual activity to the extent of having intercourse with appellant." *Id.,* 281 Pa.Superior at 108, 421 A.2d at 1171.

Instantly, we have evidence that Miss Potts accepted the money ($140.00) offered by Detective Toler to engage in a specific sexual act and she undressed in preparation for it. Since such conduct is sufficient to prove that Miss Potts "was then engaging 'in sexual activity as a business[,]' " *Commonwealth v. Danko, supra,* we fail to perceive how

the trial court's refusal to read the tendered point for charge was prejudicial, as required by *Commonwealth v. Henderson*, 249 Pa.Super. 472, 378 A.2d 393 (1977). Under the case law of this jurisdiction, a single transaction is, in fact, sufficient to contravene the Prostitution statute.

Lastly, appellant presents the claim that the trial court erred in refusing to grant her motion for a directed verdict.

The test to be utilized in determining if a directed verdict should be granted is "if the prosecution's evidence, and all inferences arising therefrom, considered in the light most favorable to the prosecution are insufficient to prove beyond a reasonable doubt that the accused is guilty of the crimes charged." (Citations omitted) *Commonwealth v. Finley*, 477 Pa. 382, 384, 383 A.2d 1259, 1260 (1978). We note that the preceding standard is equivalent to that used to rule on a sufficiency of the evidence argument.[7] *See, e.g., Commonwealth v. Harrison*, 289 Pa.Super. 126, 432 A.2d 1083 (1981).

We do not intend, at this stage of the discussion, to reiterate the facts presented by the Commonwealth in its case-in-chief, and set forth *supra*. This Court is of the opinion that, viewing the evidence in accordance with the applicable standard, the evidence introduced against the appellant was sufficient to establish her guilt as to Prostitution and Criminal Conspiracy. As we remarked in *Commonwealth v. Harrison, supra:*

> " ' " . . . it is not necessary that each piece of evidence be linked to the [defendant] beyond a reasonable doubt. It is only necessary that each piece of evidence include the [defendant] in the group who could be linked while excluding others, and that the combination of evidence link the [defendant] to the crime beyond a reasonable doubt." ' " (Citation omitted) *Id.*, 289 Pa.Superior at 136, 432 A.2d at 1089.

7. *See* note 2, *supra*. Thus, we are, in actuality, responding to appellant's attack on the sufficiency of the evidence.

We hold that the evidence was sufficient to support the trial court's denial of the motion for a directed verdict. Consequently, we find no merit to any of the issues raised on appeal, and appellant's request for relief is denied.

Judgment of sentence affirmed.