477 A.2d 1309

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Frederick MAXWELL, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1983.

Decided May 24, 1984.

154

James S. Bruno, Norristown (Court-appointed), for appellant.

Robert B. Lawler, Chief, Appeals Div., Asst. Dist. Atty., Philadelphia, Marion E. MacIntyre, Deputy Atty. Gen., for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION

McDERMOTT, Justice.

The appellant here appeals from a sentence of death.[1] If the facts alleged and resolved by the jury are legally predicated, they depict a "wickedness of disposition, a hardness of heart and recklessness of consequence," that are the very name and nature of murder. With the announced intention of robbery and "killing if necessary," appellant lured an encyclopedia salesman to his home. The victim came, hoping to show his books to a concerned and loving father. As he sat in appellant's home, he knew not the frigid cruelty that was to engulf him. He knew not that on the morrow his own son would find him, thrown into the cellar in a trash bag.

Appellant challenges the verdict below on numerous grounds.[2] These challenges center around violation of Pennsylvania Rules of Criminal Procedure Rule 1100, a warrantless search, marital privilege, prosecutorial remarks, and infliction of cruel and unusual punishment due to the imposition of the death penalty. We reject these challenges and affirm.[3]

**1.** Pursuant to 42 Pa.C.S. § 9711(h)(1), a person sentenced to death has the right to automatic review by this Court.

**2.** Appellant also has raised, by *pro se* letters addressed to this Court, numerous allegations of ineffectiveness of counsel. These assertions include: (1) failing to visit appellant at prison; (2) drafting a trial brief without consulting appellant; (3) failing to investigate how the cellar door was broken; (4) failing to challenge the Commonwealth's evidence that appellant had pled guilty to two violent felonies committed in New York; (5) failing to raise that the prosecutor was a dishonorable man; (6) turning over to the prosecutor a statement written by appellant; (7) failing to prove at trial that appellant's girlfriend was his wife; (8) failing to object to a question asked by the prosecutor during the sentencing hearing; (9) failing to object to the admission of appellant's handwriting exemplars; and (10) failing to object to a Commonwealth witness' usage of notes to refresh his recollection. After having carefully reviewed the record and the applicable precedent, we find these claims to be meritless.

**3.** Although appellant fails to raise the issue of sufficiency of the evidence, this Court in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982) *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d

The pertinent facts are summarized as follows: In May of 1979, appellant sent a card to Encyclopedia Britannica requesting a salesman to call regarding the purchase of a set of the encyclopedias. Paul Kent visited the appellant and his live-in paramour, Ann Gasper, at appellant's house, but no encyclopedias were purchased because neither of them had any funds.

On the morning of June 5, 1979, appellant instructed Ann Gasper to telephone Mr. Kent's office and ask Mr. Kent to return to appellant's household since they now had the necessary funds to buy the books. According to Ann Gasper's testimony, appellant told her and co-defendant Gary Mobley, who had been present in appellant's house that day, that he was going to rob the salesman and kill him if necessary. At appellant's request Gary Mobley went to a nearby store to buy some trashbags. Appellant told Ms. Gasper to go upstairs and get the children ready as they were going to the store. In the meantime, Mr. Kent arrived at appellant's house and for a brief while they discussed the books.

Upstairs Ann Gasper heard two gunshots. When she descended Ms. Gasper observed Paul Kent's body slumped in a dining room chair, dead. He had been shot twice in the head at close range. Appellant told Ms. Gasper to wash Mr. Kent's blood from the wall, carpet and chair while he and Gary Mobley stuffed the lifeless victim in trash bags and carried it to the cellar, where they removed the victim's wallet. Taking Mr. Kent's car the trio drove to Wanamaker's Department Store in Philadelphia, where they purchased a purse and two television sets with the victim's credit card, being the exchange for Paul Kent's life. The television sets were never claimed at the pick-up depart-

---

1327, *reh. den.,* —— U.S. ——, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983) stated that it would conduct an independent review of the record for sufficiency in capital punishment cases. Our review of the entire record, with all reasonable inferences in favor of the Commonwealth, *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976), discloses that the evidence is sufficient to sustain the convictions for murder in the first degree.

ment because the Wanamaker's salesman became suspicious of appellant's purchase and had the sets returned to his department.

The threesome then returned to appellant's house. Gary Mobley promised appellant that he would dispose of the corpse the next night when he would be least visible. The following morning, appellant broke the basement door to prevent his teenage girls from entering the basement. Ms. Gasper wrote a note to the children informing them of the basement door and that she and appellant were out shopping and would return later that evening.

Instead, appellant and Ms. Gasper drove the victim's car to New York City. Later that same afternoon the victim's son went to appellant's home to ask the whereabouts of his father. Appellant's daughters searched the house and discovered the victim's body in the trashbags. The girls went outside to a pay booth to telephone their grandmother. En route they approached two police officers who were observing the house from a car across the street and informed them of what they had seen. The police had been waiting for the arrival of a search warrant for appellant's house. The police officers requested permission to enter the house and the daughters granted it.

The fugitives never returned from New York since they were aware from appellant's mother that the police were looking for them. Fourteen months later appellant was apprehended by New York Police.

Appellant initially alleges that the trial court erred in denying his motion to dismiss the charges because he was denied his right to a speedy trial. Appellant claims that a complaint was filed against him on June 6, 1979, and that his trial did not commence until April 24, 1981.

Pennsylvania Rule of Criminal Procedure 1100 specifically provides that a defendant must be brought to trial within one hundred eighty days from the date on which the complaint is filed. *Commonwealth v. Sanford*, 497 Pa. 442, 441 A.2d 1220 (1982). Subsection (c)(1), (2) and (3) of Rule

1100 permits the Commonwealth to apply to the court for an order extending the time for commencement of trial upon a showing that the trial could not commence within the prescribed time period despite the "due diligence" of the Commonwealth.[4] Although this Court has yet to precisely define "due diligence" we have on past occasions concluded that such a showing depends on the circumstances of each particular case. *See Commonwealth v. Roman*, 494 Pa. 440, 431 A.2d 936 (1981); *Commonwealth v. Romberger*,

---

**4.** The relevant provisions of Rule 1100 of the Pennsylvania Rules of Criminal Procedure read:

\* \* \* \* \* \*

(a)(2) Trial in a court case in which a written complaint is filed against the defendant after June 30, 1974 shall commence no later than one hundred eighty (180) days from the date on which the complaint is filed.

\* \* \* \* \* \*

(b) For the purpose of this Rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or *nolo contendere.*

(c)(1) At any time prior to the expiration of the period for commencement of trial, the attorney for the Commonwealth may apply to the court for an order extending the time for commencement of trial.

(2) A copy of such motion shall be served upon the defendant through his attorney, if any, and the defendant shall also have the right to be heard thereon.

(3) Such motion shall set forth facts in support thereof, and shall be granted only upon findings based upon a record showing that trial cannot be commenced within the prescribed period despite due diligence by the Commonwealth and, if the delay is due to the court's inability to try the defendant within the prescribed period, upon findings based upon a record showing the causes of the delay and the reasons why the delay cannot be avoided.

\* \* \* \* \* \*

(d) In determining the period for commencement of trial, there shall be excluded therefrom:

(1) the period of time between the filing of the written complaint and the defendant's arrest; provided that the defendant could not be apprehended because his whereabouts were unknown and could not be determined by due diligence;

(2) any period of time for which the defendant expressly waives Rule 1100;

(3) such period of delay at any stage of the proceedings as results from:

(i) the unavailability of the defendant or his attorney;

(ii) any continuance granted at the request of the defendant or his attorney.

490 Pa. 258, 416 A.2d 458 (1980); *Commonwealth v. Ehredt*, 485 Pa. 191, 401 A.2d 358 (1979); *Commonwealth v. Mitchell*, 472 Pa. 553, 372 A.2d 826 (1977); *Commonwealth v. Mayfield*, 469 Pa. 214, 364 A.2d 1345 (1976). Moreover, this Court has held that Rule 1100 requires that the Commonwealth prove by a preponderance of evidence that it acted with due diligence in bringing a case to trial. *Commonwealth v. Ehredt, supra.*

In this case appellant argues that the Commonwealth failed to establish its due diligence since it never communicated to him through the public, by advertisements or legal notices, a warrant for his arrest, and that because of such lack of notice he did not know that he was wanted in the Paul Kent killing. This claim is as frivolous as it is macabre.

The record reveals that appellant was the focal point of a massive manhunt. He was wanted not only by local authorities, but also by state and federal authorities throughout seven states. Furthermore, appellant's own testimony contradicts this claim. While in New York, they moved to various addresses in an effort to escape apprehension. From New York Ms. Gasper telephoned appellant's mother who told her that her son should turn himself in because the police were looking for him. Ms. Gasper relayed this information to appellant. Nevertheless, appellant continued to elude police over the next fourteen months.

A person who callously kills another human being, flees to another state to conceal his whereabouts, and abandons his normal pattern of living and his children without any explanation cannot later claim he was unaware that he was wanted by the police. Because appellant intentionally concealed himself from this manhunt he cannot now complain. Moreover, under subsection (d)(1) of Rule 1100, the fourteen months that appellant evaded the police after the June 6 complaint was filed are explicitly excluded from calculating the 180 day period. Furthermore, appellant waived this issue when he appeared before Judge Ribner and requested a three month extension of Rule 1100 for the purpose of

conducting further investigation. This unequivocal on-the-record waiver of Rule 1100 provides a further ground for rejecting this claim. *Commonwealth v. Evans,* 489 Pa. 85, 413 A.2d 1025 (1980).

Appellant next maintains that his Fourth Amendment right to privacy was infringed by the warrantless search of his home. There the Philadelphia police found the body of Paul Kent, which appellant claims should have been suppressed. The trial judge justified the validity of the warrantless entry on three theories: consent, abandonment, and exigent circumstances. Conversely, appellant argues that the trial court erred on all three grounds.

Appellant first contends that the police intimidated Yolanda, appellant's daughter, thus negating her consent. We have previously held that. a mere acquiescence to a claim of lawful authority does not discharge the burden that consent must be freely and voluntarily given. *Commonwealth v. Davenport,* 453 Pa. 235, 308 A.2d 85 (1973), later app. 462 Pa. 543, 342 A.2d 67 (1975). Appellant, however, ignores the uncontradicted evidence that it was Yolanda who approached the police officers in their car and asked them to come inside the house because she wanted to show them what was in the trash bag in the basement. The police neither forced themselves upon Yolanda nor used their authority as a pretext to gain entry into appellant's house. The police officers' actions in searching the house were in direct response to Yolanda's directives. There was nothing intimidating in this scenario.

Nevertheless, appellant argues that Yolanda was incapable of giving consent because she was only sixteen years of age. Although age is one element to acknowledge in ascertaining whether consent was given willingly, minority status alone does not prevent one from giving consent. *In Re: Anthony F,* 293 Md. 146, 442 A.2d 975 (1982) (Sixteen year old sister of juvenile gave consent); *Doyle v. State of Alaska,* 633 P.2d 306 (Alaska App.1981) (Fourteen year old son gave consent); *State of Iowa v. Folkens,* 281

N.W.2d 1 (Iowa 1979) (Fourteen year old son in charge of house while mother was absent gave consent); *United States v. Bethea*, 598 F.2d 331 (4th Cir.1979) *cert. denied*, 444 U.S. 860, 100 S.Ct. 124, 62 L.Ed.2d 81 (1979); *People v. Swansey*, 62 Ill.App.3d 1015, 20 Ill.Dec. 211, 379 N.E.2d 1279 (1978).

█ The record is devoid of any evidence that would indicate that Yolanda's age itself prevented her from giving a valid consent. Nor is there evidence of any emotional immaturity or mental instability. On the contrary the record reveals that Yolanda made a very rational decision when she left her house after discovering the body. The evidence establishes that consent existed irrespective of Yolanda's age.

█ Secondly, appellant argues that the doctrine of exigent circumstances is inapplicable to this case because "the police had every reason to believe the decedent was indeed dead". This mordant hindsight overlooks one of the limited reasons for this warrantless exception.[5] Generally, police are allowed to make warrantless searches when a life threatening emergency exists. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). *Accord Commonwealth v. Norris*, 498 Pa. 308, 446 A.2d 246 (1982) (Permits search "when the officers may in good faith believe that they or someone within are in peril of bodily harm.")

**5.** The limited application of the exigent circumstance doctrine was discussed by this Court in *Commonwealth v. Norris*, 498 Pa. 308, 446 A.2d 246 (1982) which stated that this doctrine existed only in the following situations: "(1) when the officers may in good faith believe that they or someone within are in peril of bodily harm. (citation omitted); (2) when the officers have a basis for assuming that a suspect is 'armed or might resist arrest' (citation omitted); (3) when there is 'some affirmative indication to support a belief that evidence is being destroyed' (citation omitted); (4) when there are similar indications that 'the person to be arrested is fleeing' (citations omitted); or (5) when 'the facts known to officers would justify them in being virtually certain that the petitioner already knows their purpose so that an announcement would be a useless gesture.' (citations omitted)"

■ Without doubt the police in this case had reason to believe that Paul Kent was in appellant's house and in need of immediate aid. The victim had been reported missing twenty-four hours earlier by his wife; his last whereabouts were traced to appellant's house; his credit card had been used by someone else; and the police had been confronted by appellant's daughter who told them that there was an unfamiliar large trash bag in the basement of which she was afraid, and that she had found an unidentified pair of shoes and a briefcase. Moreover, because a search warrant was in transit the police would have had no reason to enter appellant's house, except to aid the victim. The lower court was correct when it reasoned that "there was a likelihood of a living, but injured, human being inside the premises." [6]

■ Appellant next argues that the trial court erred in allowing Ann Gasper to testify against him at his trial. Appellant argues that since he and Ann Gasper lived together there was a common-law marriage and thus she should have been precluded from testifying under the marital incompetency statute 42 Pa.C.S. § 5913.[7] That statute provides that spouses are neither competent nor permitted to testify against each other in criminal proceedings.[8]

6. Appellant also challenges the trial court's ruling that he no longer had an expectation of privacy because he abandoned his house by fleeing to New York. We need not discuss the merits of this claim since the warrantless entry has already been justified on two separate and independent grounds.

7. Act of May 23, 1887, P.L. 158, No. 89, Section 2(b), 19 P.S. § 683, *as amended,* 42 Pa.C.S. § 5913.

8. 42 Pa.C.S. § 5913 reads in its entirety:
 *Spouses as witnesses against each other*
 Except as otherwise provided in this subchapter, in a criminal proceeding husband and wife shall not be competent or permitted to testify against each other, except that in proceedings for desertion and maintenance, and in any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them, each shall be competent merely to prove the fact of marriage, in support of a criminal charge of bigamy alleged to have been committed by or with the other.

Moreover, the basis for invoking the marital privilege is the existence of a valid marriage. *See Commonwealth v. Clanton*, 395 Pa. 521, 151 A.2d 88 (1959); *Commonwealth v. Jones*, 224 Pa.Super. 352, 307 A.2d 397 (1973) (Testimony of an alleged common-law wife admissible). In *Clanton, supra*, this Court held that a wife was a competent witness against her second spouse because she had never divorced her first husband and he was still alive. In so holding, the *Clanton* Court reasoned that "the test is not whether the parties to an allegedly lawful marriage believe that they are lawfully married; the test is whether in law they are legally married." *Id.* 395 Pa. at 528, 151 A.2d 88.

■ The uncontradicted evidence established in the trial court showed that Ann Gasper, at the time of Mr. Kent's execution, was still legally married to one Calvin Brandon. There was no evidence proving that Ms. Gasper and Mr. Brandon had been divorced. As the trial court found, appellant and Ms. Gasper were merely cohabitating. Consequently, appellant has no legal basis for asserting the marital incompetency privilege and the testimony was properly admitted.

■ Appellant's fourth assignment of error relates to the exclusion of potential veniremen who indicated an opposition to the death penalty. Appellant contends that the exclusion of such veniremen resulted in a prosecution-prone jury. This argument is meritless. Simply questioning potential veniremen on their position regarding the death penalty, or excluding those who are strongly opposed to it and cannot impose it under any conditions, does not necessarily produce a prosecution oriented jury. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Commonwealth v. Brown*, 462 Pa. 578, 342 A.2d 84 (1975); *Commonwealth v. Kenney*, 449 Pa. 562, 297 A.2d 794 (1972); *Commonwealth v. Speller*, 445 Pa. 32, 282 A.2d 26 (1971).

Appellant complains next about the prosecutor's summation, which he claims improperly disparaged his trial coun-

sel's ethics and trial tactics. During his closing argument, the prosecutor recited:

> Let me make a couple comments about what counsel said—some of the things counsel said. There is an old adage in the law if you got the facts on your side, you argue the facts, if you got the law on your side, you argue the law, if you have neither, you blow smoke. And that is what counsel did for two hours yesterday. By putting me on trial he was blowing smoke.

(Notes of Testimony at 1072–73.)

Appellant argues that this precise metaphor prejudiced him in the jurors' eyes and prevented them from rendering an impartial verdict.

This Court has recently defined the standard for ordering a new trial in a case where a prosecutorial statement is deemed improper. *Commonwealth v. Upsher*, 497 Pa. 621, 444 A.2d 90 (1982). There we concluded that, although a prosecutor's statement may be inappropriate, a new trial will not be granted unless it is inevitable that the prosecutor's remark prejudices the defendant to such a degree that it prevents the jury from weighing the evidence and rendering a true verdict. *Id.*, 497 Pa. at 627, 444 A.2d at 92. *See also Commonwealth v. Scarpino*, 494 Pa. 421, 431 A.2d 926 (1981) (New trial warranted when unavoidable effect of prosecutorial comment is to deprive defendant of fair trial); *Commonwealth v. Martin*, 461 Pa. 289, 336 A.2d 290 (1975); *Commonwealth v. Goosby*, 450 Pa. 609, 301 A.2d 673 (1973).

Furthermore, "[T]he prejudicial effect of the district attorney's remarks must be evaluated in the context in which they occurred." *Commonwealth v. Smith*, 490 Pa. 380, 416 A.2d 986 (1980); *See also, Commonwealth v. Brown*, 489 Pa. 285, 414 A.2d 70 (1980); *Commonwealth v. Perkins*, 473 Pa. 116, 373 A.2d 1076 (1977). However, a reversal is not an automatic formality for every intemperate or improper comment by the prosecution. A trial judge will not be reversed for failing to provide an appropriate remedy

unless there has been an abuse of discretion. *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975).

 In reviewing the prosecutor's statement we do not find it to be such as to require a new trial. The remark complained of was in response to the personal attack made upon the prosecutor during appellant's counsel's summation. There was nothing inappropriate about the prosecutor's comment when reviewed in the situation in which it was made.

Appellant's sixth complaint challenges the constitutionality of the death penalty statute [9] on the grounds that it violates due process and is cruel and unusual punishment under both the Pennsylvania and United States Constitutions.[10]

Recently, this Court has thoroughly analyzed these precise arguments and rejected them. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *reh. den.* —— U.S. ——, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). There this Court held that the death penalty is neither *per se* cruel punishment nor offensive to due process under either the Pennsylvania or Federal Constitutions. *Id.*, 500 Pa. 66–74, 454 A.2d at 963–67.

Finally, appellant argues that the death sentencing procedure statute [11] is unconstitutionally vague because it does not provide an adequate standard of weighing aggravating against mitigating circumstances. Specifically, he points to the language " . . . if the jury unanimously finds one or

9. Act of December 6, 1972, P.L. 1482, No. 334, effective June 6, 1973, *as amended*, 18 Pa.C.S. § 1102.

10. Appellant also challenges this statute on the theory that it violates equal protection of the law alleging that it has been applied in a discriminatory manner in Pennsylvania. Appellant has failed to support his position with any case law or other authoritative sources, and we see no basis upon which to accept this argument.

11. Act of October 5, 1980, P.L. 693, No. 142 § 401(a), transferred to chapter 97 of the Judicial Code, 42 Pa.C.S. § 9711, previously, 18 Pa.C.S. § 1311.

more aggravating circumstances which outweigh any mitigating circumstances ..." 42 Pa.C.S.A. § 9711(c)(1)(IV). Although this claim was also considered and rejected by this Court in *Zettlemoyer, supra,* we will address the merits of this contention.

During appellant's sentencing hearing neither he nor his counsel presented any evidence of mitigating circumstances. The only evidence presented at this hearing was appellant's own testimony denying he killed Mr. Kent, a fact which the jury had previously resolved against him. Consequently, the jury found no mitigating circumstances. Hence, the only consideration required by the jury was whether the Commonwealth had proven two aggravating circumstances beyond a reasonable doubt.[12] Because appellant did not introduce any evidence of mitigating circumstances, it became unnecessary to "weigh" opposing circumstances. This Court has consistently held that a claimant cannot challenge the constitutionality of a statute abstractly; he is afforded such right only if it is sought to be enforced in his particular case. *Commonwealth v. One 1976 Ford Truck Van,* 492 Pa. 541, 424 A.2d 1323 (1981) *cert. denied,* 454 U.S. 819, 102 S.Ct. 99, 70 L.Ed.2d 89 (1981); *Commonwealth v. Bonadio,* 490 Pa. 91, 415 A.2d 47 (1980); *Knowles' Estate,* 295 Pa. 571, 145 A. 797 (1929).

In this case, because appellant did not introduce any mitigating circumstances, the jury never had to consider the application of 42 Pa.C.S. § 9711(c)(1)(iv); accordingly, appellant cannot now question it. Cf: *Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977) *cert. denied,* 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978). (Person has automatic standing to challenge death penalty statute which has been held unconstitutional.)

**12.** The two aggravating circumstances the Commonwealth was required to prove beyond a reasonable doubt as instructed by the trial court were: (1) whether the defendant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6) and (2) whether the defendant had a significant history of felony convictions involving the use or threat of violence to the person 42 Pa.C.S. § 9711(d)(9).

Finally, we address, *sua sponte*,[13] whether the sentence of death imposed by the jury in the instant case is excessive or disproportionate to those of other similarly situated defendants. 42 Pa.C.S. § 9711(h)(3)(iii). *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984). Our analysis is aided by a comprehensive study [14] conducted by the Administrative Office of Pennsylvania Courts (hereinafter "AOPC") which has reviewed the sentences sought and obtained for all convictions for murder in the first degree between September 13, 1978 and February, 1984, the period of time for the relevant and effective sentencing procedures. Included in the study are the facts and circumstances of the crimes, the gender, race and age of the defendant and victim, the defendant's prior criminal record, if any, and other data relating to the conduct and prosecution of each case.

■■■ We have carefully studied the data compiled by the AOPC and have found that in cases where a defendant did not present any mitigating circumstances and the prosecution proved at least one, and in most cases two or more, aggravating circumstances, the sentence of death has always been imposed. More importantly, in those cases that were identical to appellant's, that is where there were no mitigating circumstances and the same two aggravating circumstances (killing a person while in the perpetration of a felony and the defendant having a significant history of felony convictions involving the use or threat of violence to the person 42 Pa.C.S. § 9711(d)(6)(9)) had been proved by the Commonwealth, all defendants received the death penalty.

13. We note that the United States Supreme Court in *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) has held that the Federal Constitution does not require a proportionality review in every case in which the death sentence has been imposed.

14. This study is entitled "Pennsylvania Death Penalty Study," and it had been ordered by this Court in *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984). This study is an ongoing one and we have imposed a continuing obligation on the President Judge of every county to supply updated data to AOPC on each First Degree Murder conviction.

In light of the findings in AOPC's study and our own independent evaluation of the entire record in this case, we conclude that the sentence of death imposed by the jury in the instant case was neither excessive nor disproportionate to penalties imposed in similar cases. Therefore, we sustain the conviction of murder in the first degree and affirm the sentence of death.[15]

NIX, C.J., files a dissenting opinion.

Former C.J. ROBERTS did not participate in the decision of this matter.

NIX, Chief Justice, dissenting.

I dissent.

No proposition is more fundamental to our accepted notions of due process than the proposition that a person charged with a serious crime is entitled, as a matter of right, to trial by a fair and impartial jury selected from a representative cross-section of the community. *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Commonwealth v. Cohen*, 489 Pa. 167, 413 A.2d 1066, *cert. denied*, 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980); *Philadelphia Newspapers, Inc. v. Jerome*, 478 Pa. 484, 387 A.2d 425 (1978), *appeal dismissed*, 443 U.S. 913, 99 S.Ct. 3104, 61 L.Ed.2d 877 (1979); *Commonwealth v. Hoss*, 469 Pa. 195, 364 A.2d 1335 (1976); *Commonwealth v. Jones*, 465 Pa. 473, 350 A.2d 862 (1976); *Commonwealth v. Jones*, 452 Pa. 299, 304 A.2d 684 (1973); *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209, *cert. denied*, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973); *Commonwealth v. Stewart*, 449 Pa. 50, 295 A.2d 303 (1972), *cert. denied*, 417 U.S. 949, 94 S.Ct. 3078, 41 L.Ed.2d 670 (1974); *Commonwealth v. Cornitcher*, 447 Pa. 539, 291 A.2d 521 (1972);

**15.** Because we have upheld the sentence of death imposed by the jury, we hereby direct the prothonotary of the Eastern District to transmit to the Governor, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court as required by 42 Pa.C.S. § 9711(i).

*Commonwealth v. Carroll,* 443 Pa. 518, 278 A.2d 898 (1971); *Commonwealth ex rel. Smith v. Patterson,* 409 Pa. 500, 187 A.2d 278 (1963); *William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 173 A.2d 59, *cert. denied,* 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961). This basic precept is deeply rooted in the rights to jury trial and to due process of law guaranteed under both the federal and our state constitutions. U.S. Const. Amends. 5, 6, 14; Pa. Const. Art. I, §§ 6, 9. The grave decision as to whether a defendant is guilty or not guilty of a capital crime must not be made on scales tipped by state procedures toward guilt. *Cf. Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). I believe the time has come to acknowledge on the basis of the considerable reliable empirical data now available that which common sense has long suggested to be true, namely, that the death qualification process practiced in this and other jurisdictions produces juries that are both prosecution-prone and unrepresentative.

Appellant's challenge to Pennsylvania's death qualification procedure cannot properly be disposed of, as the majority purports to do, by a passing reference to *Witherspoon v. Illinois, supra.* In *Witherspoon* the United States Supreme Court declined to find that the exclusion of jurors unalterably opposed to capital punishment results in an unrepresentative jury or substantially increases the risk of conviction, concluding that the data made available to the Court was "too tentative and fragmentary." *Id.* at 517, 88 S.Ct. at 1774. The Court, however, left open the possibility that "a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt.*" *Id.* at 520 n. 18, 88 S.Ct. at 1776 n. 18. The *Witherspoon* Court thus made it clear that more impressive empirical data would be required before the prosecution-proneness question could be resolved.

In the intervening fifteen years, the *Witherspoon* Court's understandable hesitancy has generated numerous studies of increasing reliability and precision in support of the dual

hypothesis that death qualified juries are both prosecution-prone and unrepresentative. These studies now demonstrate convincingly that persons favoring the death penalty are significantly more likely to vote for conviction in capital cases and that persons excluded from jury service on the basis of their unwillingness to impose the death penalty represent a distinct and sizeable group in the community. Thus it would appear that *Witherspoon* no longer presents a valid obstacle to the challenge raised herein. In fact, faced with the mass of information presently available, at least two federal trial courts have now invalidated state death qualification procedures on federal constitutional grounds. *Keeten v. Garrison*, 578 F.Supp. 1164 (W.D.N.C. 1984); *Grigsby v. Mabry*, 569 F.Supp. 1273 (E.D.Ark.1983). The United States Supreme Court has yet to reevaluate its position in *Witherspoon*. Without attempting to predict the outcome of such a reassessment by that Court, I am satisfied that the death qualification procedure violates the guarantees of Article I, sections 6 and 9 of the Pennsylvania Constitution [1] and would so hold.

The prosecution-proneness of death qualified jurors is firmly established by the results of a definitive study of the question reported in Cowan, Thompson & Ellsworth, *The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation*, 8 Law & Human Behavior 53 (1984) (hereinafter *"Cowan"*). The participants in the study were 288 adults eligible for jury

**1.** Trial by jury shall be as heretofore, and the right thereof remain inviolate.
Pa. Const. Art. I, § 6.
In all criminal prosecutions the accused hath a right to be heard by himself and his counsel, to demand the nature and cause of the accusation against him, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and, in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage; he cannot be compelled to give evidence against himself, nor can he be deprived of his life, liberty, or property, unless by the judgment of his peers or the law of the land.
Pa. Const. Art. I, § 9.

service.[2] Each was questioned as to his or her attitude toward the death penalty. Those indicating an unwillingness to impose the death penalty in any case were classified as *"Witherspoon*-excludables" while those who stated they would consider voting to impose it in some cases were labeled "death qualified." The participants were also asked whether they would be fair and impartial in deciding the question of guilt or innocence, and those who answered that they would not were excluded. The remaining subjects were shown a videotape of a simulated trial "complex enough to afford several plausible interpretations and verdict preferences." *Id.* at 63. A verdict questionnaire was distributed to each participant at the conclusion of the videotape. A tabulation of the votes revealed that *77.9 percent* of the death qualified subjects voted to convict of some level of homicide, as opposed to only 53.3 percent of the *Witherspoon*-excludables, a highly significant difference of *25 percent.*[3] The Cowan study is of considerable

**2.** The study's analysis of its subject sample's characteristics revealed the following:

The subject sample was fairly representative of the suburban upper-middleclass community surrounding Stanford University, except that males and minorities were under-represented. The sample was 93% white, comprising 35.4% males and 64.6% females. The average age of subjects was 43, and 64.4% of the sample was currently employed outside the home. Married persons were 46% of the sample; 25% were single, 19% divorced, 4% separated, and 6% widowed. The median educational level was slightly less than a baccalaureate degree. Registered Democrats were 45.3% of the sample, Republicans 33.5% and unregistered 6.8%, with the remainder divided among Independent voters and small parties. In the category of religious affiliation, 35% listed themselves as Protestant, 17% as Catholic, 9% as Jewish, 25% listed no affiliation, and 14% listed other religions. Finally, 45% of the sample had previously done jury duty, while 36% had actually served on juries.

Cowan, Thompson & Ellsworth, The Effects of Death Qualification on Jurors' Predisposition to Convict and on the Quality of Deliberation, 8 Law & Human Behavior 53, 67 (1984) (hereinafter *"Cowan"*).

**3.** *Cowan, supra* at 68, states: "This difference is highly significant ($^2(1) = 7.46$, p $<.01$) and indicates that a departure from representativeness created by the process of restricting juries in capital cases to death-qualified jurors creates a bias against defendants in death penalty trials." A significance level of p $<.01$ indicates a probability of 99

importance not only for its finding of a high correlation between death penalty attitudes and conviction-proneness, but also because it successfully replicated the results of prior post-*Witherspoon* studies. *See* Jurow, *New Data on the Effect of a Death Qualified Jury on the Guilt Determination Process*, 84 Harv.L.Rev. 567 (1971); White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries*, 58 Cornell L.Rev. 1176 (1973) (reporting a 1971 study by Louis Harris and Associates).

The conclusion that death qualified juries are conviction-prone is further buttressed by a number of studies which reveal why death qualified juries are more likely to convict. *See, e.g., Cowan, supra;* Fitzgerald & Ellsworth, *Due Process vs. Crime Control: Death Qualification and Jury Attitudes*, 8 Law & Human Behavior 31 (1984) (hereinafter *"Fitzgerald "*); Thompson, Cowan, Ellsworth & Harrington, *Death Penalty Attitudes and Conviction Proneness*, 8 Law & Human Behavior 94 (1984) (hereinafter *"Thompson"*); Bronson, *On the Conviction-Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen*, 42 U.Colo.L.Rev. 1 (1970) (hereinafter *"Bronson"*). One study demonstrated that "death-qualified subjects evaluated the evidence in a way markedly more favorable to the prosecution than did excludables." *Thompson, supra* at 103. That study also found that "relative to excludables, death-qualified subjects express less regret for erroneous convictions and more for erroneous acquittals," *id.* at 109, "indicating that less evidence is necessary to convince death-qualified jurors beyond a reasonable doubt." *Id.* at 111.

Another study reveals "a consistent pattern of differences between death-qualified and excludable jurors." *Fitzgerald, supra* at 45. As compared with *Witherspoon* excludables, death qualified jurors are more punitive, less sensitive to procedural and constitutional guarantees, biased in favor of the prosecutor and against defense counsel,

percent that the difference observed is real rather than the product of chance.

and more willing to ignore a judge's instructions regarding pretrial publicity, in each case to a statistically significant degree. *Id.* The causal relationship between such attitudes and the tendency to convict requires no elaboration.

Like death qualified jurors, *Witherspoon* -excludables have been shown to share a set of interrelated attitudes toward the criminal justice system. These attitudes are distinct from those possessed by death qualified jurors, even those who express some opposition to capital punishment. *Fitzgerald, supra; Bronson, supra; see Grisby v. Mabry, supra.* Moreover, it has been established that persons who share such attitudes constitute a sizeable group within the community. *Fitzgerald, supra; Bronson, supra; see Keeten v. Garrison, supra; Grigsby v. Mabry, supra.* Thus, the effect of the death qualification process is to systematically exclude all members of a cognizable group. As a result of the death qualification process, a significant viewpoint goes unrepresented on the capital jury, rendering that jury unrepresentative.

The strong empirical evidence amassed in the wake of *Witherspoon* has been well summarized as follows:

> The evidence . . . clearly establishes that a juror's attitude toward the death penalty is the most powerful known predictor of his overall predisposition in a capital criminal case. That evidence shows that persons who favor the death penalty are predisposed in favor of the prosecution and are uncommonly predisposed against the defendant. The evidence shows that death penalty attitudes are highly correlated with other criminal justice attitudes. Generally, those who favor the death penalty are more likely to trust prosecutors, distrust defense counsel, to believe the state's witnesses, and to disapprove of certain of the accepted rights of defendants in criminal cases. A jury so selected will not, therefore, be composed of a cross section of the community. Rather, it will be composed of a group of persons who are uncommonly predisposed to favor the prosecution, a jury "organized to convict." *Grisby v. Mabry, supra* at 1273.

In view of this compelling evidence of the unfairness of our present system, I cannot accept the execution of a death sentence resulting from such a process. The interest of justice cries out against the inequity of our present situation and our sense of fairness should respond. Appellant is entitled to a new trial before an impartial and representative jury.