548 A.2d 604

**COMMONWEALTH of Pennsylvania**

v.

**Robert BRICKER, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 28, 1986.

Filed Sept. 26, 1988.

266

Lawrence J. O'Toole, Jr., North Versailles, for appellant.

Dara A. DeCourcy, Assistant District Attorney, Pittsburgh, for Com., appellee.

Before CIRILLO, President Judge, and BROSKY and JOHNSON, JJ.

CIRILLO, President Judge:

This is an appeal from a judgment of sentence imposed by the Court of Common Pleas of Allegheny County. We affirm.

Appellant, Robert Bricker, was arrested and charged with one count of criminal homicide. His case was consolidated for trial with co-defendants Thomas Skelton, James Griffin, Samuel Rende, and James Watson, but was subsequently severed by court order. Following a jury trial, Bricker was adjudged guilty of first-degree murder, and was sentenced

to life imprisonment. He filed post-verdict motions which were untimely in contravention of Pa.R.Crim.P. 1123(a). Consequently, Bricker's appeal from the judgment of sentence was quashed *sua sponte*. Bricker filed a petition under the Post Conviction Hearing Act, 42 Pa.C.S. § 9541–9551 (Purdon 1982) (amended 1988). The petition was granted and Bricker's appellate rights were reinstated *nunc pro tunc*. Bricker then filed a new notice of appeal.

In a 1987 memorandum, a panel of this court affirmed the 1986 trial court judgment of sentence. The Pennsylvania Supreme Court subsequently granted allocatur, vacated this court's affirmance of the judgment of sentence, and remanded the case to this court for further proceedings. 518 Pa. 68, 540 A.2d 932. Pursuant to our supreme court's order, we now consider on remand the issue of whether the trial court erred in admitting the testimony of Commonwealth witness Charles Rossi in light of *Commonwealth v. Bricker*, 506 Pa. 571, 487 A.2d 346 (1985).

Bricker was charged for his complicity in the December 14, 1978 killing of Norman McGregor. The events leading to McGregor's murder began in March of 1978. At that time, as a result of growing animosity between Thomas Skelton and McGregor, Skelton decided to have McGregor killed. Skelton made his plans known to Samuel Rende who, on Skelton's behalf, told Charles Kellington of the scheme. Kellington, in turn, discussed the killing with James Griffin and Gerald Walls. These men offered Bricker's name for the job. Griffin quoted Kellington a price of $10,000.

Skelton agreed to pay that amount, and gave Kellington an initial payment of $2,500. Skelton also supplied Kellington with McGregor's physical description, residence and job locations, and personal "hang-outs." Kellington subsequently gave Griffin the $2,500. In addition, he related the information regarding McGregor to Griffin and Walls. Walls, in turn, supplied Bricker with that information.

In July of 1978, Charles Rossi agreed to assist in the killing at Bricker's request. Bricker gave Rossi the infor-

mation on McGregor, and told him that they would split the money he was to be paid for the job.

Approximately one week later, Bricker brought in James Watson to assist with the killing. At that time, he instructed Watson and Rossi to find and kill McGregor.

Bricker, Watson, and Rossi alternated in stakeouts for several weeks, waiting for an opportunity to kill McGregor. This included an incident where Watson shot James "Smitty" Smith, whom Watson mistakenly believed to be McGregor. The shooting prompted Bricker, who had not had any contact with Kellington to this point, to agree to deal directly with him on the condition that he, Bricker, receive an additional $2,500 up front. Through Kellington, Skelton paid Bricker that $2,500, and then paid the final $2,500 payment due on the contract. Kellington then personally guided Bricker on a tour of McGregor's "hang-outs."

For several more weeks, Bricker, Watson, and Rossi attempted, unsuccessfully, to kill McGregor. Finally, on December 14, 1978, Bricker told Rossi that Watson had killed McGregor. Rossi was paid $800, and later received an additional $1,000 from Bricker.

At trial, direct examination of the Commonwealth's witness, Charles Rossi, revealed Rossi's long history of incarceration. It was then disclosed that Rossi had been acquainted with Bricker for nineteen years. The relevant testimony is as follows:

A. ... I served 11 months for larceny of a car in Whitehill, Pennsylvania when I was about 21½ years old. And in 1943 I received 70 years, some of them concurrent. Some sentences were concurrent and some were consecutive 10 year sentences, and they accumulated to be 30 years in the West Virginia Penitentiary for sticking up a gambling establishment in Wheeling, West Virginia. And I served about 15 years there.

Q. Of that sentence you served 15 years?

A. About 15 years, that's correct.

Q. Okay.

A. And then a couple of years after that I got found guilty of First Degree Murder of a bookie. I received life there.

Q. And were you the individual that had actually engaged in the killing of that bookie?

A. No, I was not.

Q. And you were convicted as an accomplice?

A. As an accomplice under the Felony Statute.

Q. And so that you were, as an accomplice, found guilty of First Degree Murder?

A. Yes, I was.

Q. Do you know what your sentence was?

A. I received a life sentence.

Q. And how much time did you actually serve?

A. I served about 15½ years.

Q. You were then paroled?

A. Yes.

Q. Okay. Now, at the time you first became involved in the McGregor matter, you were not in prison I take it?

A. No, I was out then.

Q. Okay.

A. Yes, I was on parole.

Q. And you had served prior to that time—you had served a total of how many years in prison? Not your sentence but the time that you actually served.

A. About 31 years.

Later in his testimony, Rossi admitted knowing Gerald Walls and James Watson. Rossi was then questioned about his acquaintance with Bricker:

Q. Now, let's just take July of 1978. Did you know Robert Bricker, the defendant seated at counsel table, in July of 1978?

A. I did.

Q. And for how long a period of time had you known him?

MR. O'TOOLE: Your Honor, may we approach the bench?

THE COURT: Yes, sir.

Appellant's counsel objected, at which time there was a side bar discussion. The trial judge overruled the objection and the testimony of Rossi resumed:

Q. You say that as of July of 1978 you knew Robert Bricker?

A. That is true.

Q. Just tell us in terms of months or years how long had you known Mr. Bricker?

A. Around 19 years.

Q. At that time?

A. Yes.

Q. Okay.

A. No, wait a minute. Wait a minute. Let me think now. Yes, that's correct. Around 19 years.

Q. All right. And is that Robert Bricker the same individual who is seated at counsel table here today in the tan coat with his attorney?

A. It is.

Bricker asserts that this testimony could have led the jury to infer that the two men had met while in prison, thus improperly alluding to the fact that Bricker had a history of prior criminal activity. Based on this contention, Bricker claims he is entitled to a new trial.

It is undisputed in this Commonwealth that "the prosecution may not introduce evidence of the defendant's prior criminal conduct as substantive evidence of his guilt of the present charge." *Commonwealth v. Richardson*, 496 Pa. 521, 526, 437 A.2d 1162, 1165 (1981); *Commonwealth v. Allen*, 448 Pa. 177, 181, 292 A.2d 373, 375 (1972); *Commonwealth v. Zabala*, 303 Pa.Super. 72, 79, 449 A.2d 583, 587 (1982). Any reference to a defendant's prior criminal activity is improper and generally inadmissible, unless the evi-

dence revealed assists in proving motive, intent, absence of mistake or accident, a common scheme or design linking two or more crimes so related that the evidence in one tends to prove the other, or the identity of the accused through a logical connection between the crimes so that proof of one will naturally lead to the belief that both crimes were committed by the same person. *Commonwealth v. Banks*, 513 Pa. 318, 349–50, 521 A.2d 1, 17 (1987), *cert. den.*, — U.S. —, 108 S.Ct. 211, 98 L.Ed.2d 162 (1987); *Commonwealth v. Green*, 351 Pa.Super. 170, 176, 505 A.2d 321, 324 (1986), *alloc. den.*, 513 Pa. 633, 520 A.2d 1384 (1987); *Commonwealth v. Shirey*, 333 Pa.Super. 85, 122–23, 481 A.2d 1314, 1334 (1984). Moreover, the Pennsylvania Supreme Court has held that it will recognize additional exceptions if the probative value of evidence outweighs any potential prejudicial effect upon the jury. *Banks*, 513 Pa. at 350, 521 A.2d at 17.

Admission of testimony from which a jury could infer past criminal conduct by defendant ordinarily constitutes reversible error. As our supreme court explained in *Commonwealth v. Allen*, 448 Pa. 177, 292 A.2d 373 (1972):

The purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more liable to commit that crime for which he is being tried. The presumed effect of such evidence is to predispose the minds of the jurors to believe the accused guilty, and thus [effectively] to strip him of the presumption of innocence.

448 Pa. at 182, 292 A.2d at 375 (quoting *Commonwealth v. Trowery*, 211 Pa.Super. 171, 173–174, 235 A.2d 171, 172 (1967)). The court went on to explain that, recognizing the prejudicial effect of such evidence, "there is no justification for indirectly allowing the introduction of prior criminal activity by reference to photographs of the accused." 448 Pa. at 182, 292 A.2d at 375. However, reversal is not warranted unless the record indicates that prejudice result-

ed from the remark. *Commonwealth v. Allen*, 448 Pa. at 181, 292 A.2d at 375 (1972); *Commonwealth v. Maute*, 336 Pa.Super. 394, 485 A.2d 1138 (1984). The testimonial reference can be found prejudicial only if it conveys to the jury, either expressly or by reasonable implication, the fact that defendant committed a prior criminal offense. *Commonwealth v. Dooley*, 332 Pa.Super. 227, 481 A.2d 336 (1984). "[T]he controlling question is whether or not a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity." *Allen*, 448 Pa. at 181, 292 A.2d at 375, *see also Maute*, 336 Pa.Super. at 403, 485 A.2d at 1143; *Commonwealth v. Gaerttner*, 335 Pa.Super. 203, 219, 484 A.2d 92, 106 (1984); *Commonwealth v. Hamm*, 325 Pa.Super. 401, 412, 473 A.2d 128, 134 (1984); *Commonwealth v. Potts*, 314 Pa.Super. 256, 274, 460 A.2d 1127, 1136 (1983). Moreover, the determination of whether the evidence is admissible is left to the discretion of the trial court, and an appellate court should not reverse absent an abuse of discretion. *Banks*, 513 Pa. at 350, 521 A.2d at 17; *Green*, 351 Pa.Super. at 176–77, 505 A.2d at 324.

In *Commonwealth v. Bricker*, 506 Pa. 571, 487 A.2d 346 (1985), a separate case involving the same individuals as this appeal, Commonwealth witness Rossi testified in essentially the same manner as in the instant case. He testified as to his own criminal record and the time he served in prison. The assistant district attorney then asked Rossi the following question: "Have you known Mr. Bricker for a substantial period of time?" As in the instant case, Rossi responded, "About 20 years." Defense counsel objected to this testimony on the basis of improper reference to prior criminal conduct, and also on the basis of prosecutorial misconduct. A plurality of the Pennsylvania Supreme Court found that Rossi's statement that he knew Bricker for twenty years showed that he knew Bricker while in prison, and that a jury could reasonably have inferred that Bricker had been in prison. *Id.*, 506 Pa. at 583, 487 A.2d at 352 (per Zappala, J., with one Justice concurring and two Justices concurring in the result).

During the trial in that case, the prosecutor continually exhibited flagrant misconduct. Based on the prosecutor's transgressions, Justice Zappala, with Chief Justice Nix concurring, stated: "[R]epeated instances of misconduct permeated the entire proceeding so as to effectively deny ... [Bricker] a fair trial." *Id.*, 506 Pa. at 588, 487 A.2d at 354. Justice Larsen concurred in the result reached by Justice Zappala, and Justice Hutchinson concurred in the result because the record was inadequate for effective appellate review. Three justices dissented. The case was therefore reversed and remanded for a new trial. We find no clear majority decision on the specific issue before us,[1] and therefore we cannot find *Bricker, supra,* controlling. *See Commonwealth v. Scott,* 279 Pa.Super. 8, 420 A.2d 717 (1980) (plurality opinions do not automatically have precedential value).

*Allen, supra,* is the seminal decision on the issue of testimonial references which may suggest prior unrelated criminal activity on the part of the accused. There, the appellant claimed that reversible error was committed when, over timely objection, the trial court permitted several of the Commonwealth's witnesses to make references to the fact that the police had shown photographs of the appellant to the alleged eyewitnesses. Allen claimed this allowed the jury to infer that he had a prior criminal record. The court stated: "Certainly, the constant mention of photographs during direct examination permitted the jury to infer that the appellant had a prior criminal record." 448 Pa. at 182–83, 292 A.2d at 376. Our supreme court concluded that since there was no reasonable explanation as to how

**1.** We note the view of the three dissenting justices:
  There is no basis for the assertion that the prosecutor inferred that appellant had served time in prison for prior crimes. The prosecutor merely introduced evidence that one of the defense witnesses, Rossi, who had known appellant for 20 years, had been in prison for various periods during those 20 years. The mere fact that appellant knew someone who had been imprisoned is not evidence that appellant too had served time, and it is unreasonable to assume that only persons with records of criminal convictions could be acquainted with individuals who had served time in prison.
  *Id.,* 506 Pa. at 591, 487 A.2d at 355.

the police obtained photographs of the appellant other than through his prior criminal activity, the appellant had been prejudiced and a new trial was warranted. *Id.*, 448 Pa. at 182–83, 292 A.2d at 376.

In *Commonwealth v. Jackson*, 263 Pa.Super. 183, 397 A.2d 807 (1979), we applied *Allen*. There, Jackson contended that a Commonwealth witness improperly referred to pictures which appeared on the station house bulletin board as recently as the morning after the robbery. Although the pictures were never identified as "mug shots," this court found a "sufficient nexus between the pictures and a police source to warrant a reasonable inference of prior criminal activity." *Jackson*, 263 Pa.Super. at 185, 397 A.2d at 808. However, in *Commonwealth v. Reiss*, 503 Pa. 45, 468 A.2d 451 (1983), our supreme court held that where there is no indication that the photographs were "mugshots" or that they came from police files, it is not error for a witness to testify that he identified a defendant from photographs shown to him by police. In *Reiss*, the victim testified that he went with a police investigator to police headquarters. While there, the investigator showed the witness a packet of photographs, from which the witness picked out defendant's picture. The court stated:

> Defendant would have us believe that the fact that his picture was in the possession of the police, without any explanation as to how it was obtained, would cause the jury to infer prior criminal conduct. We disagree. The jury could easily have believed that the police had photographs of individuals who had no criminal records, for example, the jury could have inferred that the photographs came from a neutral source; or the jury may not even have questioned the source of the photographs. To hold that the jury drew the inference that defendant had engaged in prior criminal activity on these facts alone would be an unreasonable and unsubstantiated conclusion.

*Reiss*, 503 Pa. at 50, 468 A.2d at 453 (emphasis ours).

*Allen* and *Reiss* are not easily reconcilable; factually, they are only slightly dissimilar. The instant case, how-

ever, can be distinguished from both cases. First, unlike *Allen* and *Reiss,* we are not here concerned with references to photographs or "mug shots," which, in this court's opinion, are more likely to raise the inference of prior criminal activity than a witness testifying as to his own criminal activity, and then testifying that he knew the defendant. Further, there certainly are reasonable explanations for Rossi's and Bricker's acquaintance, other than that Bricker had also spent time in prison. Rossi testified that he went to jail in 1943, and served "[a]bout 15 years" until 1958. Rossi was then jailed "a couple of years after that" for an additional fifteen and one-half years. Rossi testified that he knew several of the people involved in the conspiracy, including Kellington, Griffin, Walls, and Watson, as well as Bricker. Rossi stated that when he was first contacted by Bricker regarding the McGregor matter in July of 1978, he had known Bricker for "[a]round 19 years." The jury could have reasonably and easily inferred that Rossi and Bricker met during the period of time between Rossi's prison terms, or through a mutual acquaintance. Rossi never stated that he met Bricker while in prison. Moreover, Rossi never alluded to Bricker ever being in jail or ever being involved in criminal activity whatsoever. Rossi plainly and simply admitted that he himself had been in jail, and acknowledged that he had been acquainted with Bricker for nineteen years. The testimony elicited from Commonwealth witness Rossi regarding his time in jail, followed by his testimony that he knew appellant Bricker, did not indicate to the jury that Bricker had a criminal record.

In *Commonwealth v. Green,* 315 Pa.Super. 564, 462 A.2d 736 (1983), the defendant's sister testified that the defendant had been sent to a "group home," and had "got in some trouble." The witness also made other testimonial references to prior criminal conduct of the defendant. The court found that these references indicated to the jury that the defendant had a prior criminal record. This testimony is much more susceptible to the inference of prior criminal activity than is Rossi's in the instant case. Unlike the

witness in *Green,* Rossi's only reference to Bricker was that he knew him for nineteen years.

However, assuming *arguendo* that the jury could infer from the testimony that Bricker had also been incarcerated, and that Bricker was therefore prejudiced, we would not find reversible error. Where this court is convinced beyond a reasonable doubt that the error did not contribute to the verdict, we may hold that reversal is not required because the error was harmless. *Commonwealth v. Maxwell,* 505 Pa. 152, 166, 477 A.2d 1309, 1316–17 (1984), *cert. den.,* 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 *application den.,* 469 U.S. 1070, 105 S.Ct. 561, 83 L.Ed.2d 502 *reh. den.,* 472 U.S. 1033, 105 S.Ct. 3516, 87 L.Ed.2d 644 (1985); *Commonwealth v. Upsher,* 497 Pa. 621, 627, 444 A.2d 90, 93 (1982); *Commonwealth v. Story,* 476 Pa. 391, 409–11, 383 A.2d 155, 164–65 (1978).

The Pennsylvania Supreme Court has held that "an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict." *Commonwealth v. Story,* 476 Pa. at 412, 383 A.2d at 166, citing *Commonwealth v. Davis,* 452 Pa. 171, 178–79, 305 A.2d 715, 719 (1973); *accord, Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1058, 31 L.Ed.2d 340 (1972). The overwhelming evidence test requires that a reviewing court first determine "whether the untainted evidence, considered independently of the tainted evidence, overwhelmingly establishes the defendant's guilt." *Story,* 476 Pa. at 413, 383 A.2d at 166. If the court finds the evidence of guilt is overwhelming, it then decides if "the error was so insignificant by comparison that it could not have contributed to the verdict." *Id.,* 476 Pa. at 413, 383 A.2d at 166. If "honest, fair minded jurors might very well have brought in [a] not guilty verdict[ ]," an error cannot be harmless on the basis of overwhelming evidence. *Davis,* 452 Pa. at 181, 305 A.2d at 721, quoting

*Chapman v. California,* 386 U.S. 18, 26, 87 S.Ct. 824, 829, 17 L.Ed.2d 705 (1967).

In *Story,* our supreme court emphasized that the untainted evidence examined must be uncontradicted in order to find harmless error based on overwhelming evidence of guilt. Unless the evidence is uncontradicted, a fair minded juror may well choose to credit the defendant's testimony, rather than the Commonwealth's evidence. 476 Pa. at 415–16, 383 A.2d at 167. *See Commonwealth v. Henderson,* 456 Pa. 234, 317 A.2d 288 (1974) (error held *not* harmless under overwhelming evidence test where there was evidence which contradicted defendant's guilt). The court went on to note that the determination of whether an error is harmless based on overwhelming evidence of guilt is closely tied to the facts of the particular case, thus requiring examination of the entire record. *Story,* 476 Pa. at 413 n. 24, 383 A.2d at 166, n. 24.

In summary, then, the court must answer each of the following questions affirmatively before concluding that the error was harmless under the overwhelming evidence test:

(1) does the untainted evidence, when examined independently, overwhelmingly establish the defendant's guilt?

(2) is the untainted evidence uncontradicted?

(3) is the error, when compared to the overwhelming evidence of guilt, so insignificant that it could not have contributed to the verdict?

A thorough review of the record reveals that several key witnesses offered testimony that was extremely damaging to Bricker. Charles Rossi depicted Bricker's activities throughout all stages of the scheme to kill McGregor. Rossi's involvement came about when he was contacted by Bricker regarding the "contract killing." Bricker, described by Rossi as "the set up man," was "the man that has been given the job of picking out who he is going to get to do the contract murder. And he is also the man who is collecting the money from whoever is putting out the contract." According to Rossi, Bricker monitored the payments, timing, and strategy for the "job." Bricker also supplied Rossi

with commentary of the actual attempts, including how he "layed out" at McGregor's house, interpreted to mean "[l]ay for him near the house in trying to kill him." In the months and years following the "hit," Bricker described the killing to Rossi. Referring to Bricker, Rossi stated that "[i]t was his contract killing.... He told me who the victim was, Norman McGregor." And, finally, "... it was Mr. Bricker's job. It was his contract."

The testimony of Charles Kellington further linked Bricker to the events leading to McGregor's killing. During the early stages of the plan, Bricker accidently shot another man while attempting to kill McGregor. Kellington testified that Bricker admitted doing that shooting, and told Kellington that he "blew him off of the bar stool." Later on in his testimony, Kellington described a phone conversation between himself and Bricker that had transpired after McGregor had been killed:

Q: You got a phone call from who?

A: Mr. Bricker.

Q: Okay. He told you what?

A: That he did it. It is done.

Q: He told you—he referred to his having killed Norman McGregor?

A: Yes.

Q: And what else did he say?

A: He said: Get the rest of my money.

After Kellington had paid Bricker the remaining fee, Bricker spoke to him about the actual event: "He says [sic] he is laying there and the guy came home and he shot him. And he was running to his car or something and the light came on and he shot him some more." Witness Gerald Walls, another party in the conspiracy, also testified to Bricker's involvement in the killing. Wall recounted the conversation he had with Bricker when Bricker told him of McGregor's death:

A: ... And Bricker said: I finally caught that guy. And I looked at him and I said: Oh, really? And he said:

Yes. And he said: We had to shoot him several times to get him down.

> And then he related that the guy pulled up to his house, shot him in the side. They made two shots, one hit him in the side or something. And then the guy was screaming and running to the doorway to the house. And I believe somebody turned on the light and the guy hollered: Turn out the damn light. And this was the final shot, the third shot, I believe, that killed him.
>
> Q: And was this related to you by Bricker on this occasion?
>
> A: Yes, sir.

Upon review of the entire record, it becomes overwhelmingly clear that, at the very least, Bricker had a key role in procuring the killing, and at worst he was, in fact, the trigger man. As the events were described, many of the witnesses spoke of Bricker's involvement. Moreover, Bricker offered no evidence to controvert the witnesses' testimony. Thus, when compared to the rest of the testimony, Rossi's comments regarding his own time in prison and his acquaintance with Bricker become extremely insignificant. Bricker's guilt was established by the damaging and uncontradicted testimony of several witnesses, not by his alleged association with Rossi.

In *Green*, also, we note that despite the witness' testimony that the defendant had been in trouble before and had been in a group home, the testimonial reference error was held harmless in light of the overwhelming evidence of the defendant's guilt. *Green, supra,* 315 Pa.Superior Ct. at 576–77, 462 A.2d at 742 (citing *Commonwealth v. Weakland,* 273 Pa.Super. 361, 417 A.2d 690 (1979)). As *Story* and *Green* illustrate, where the evidence of guilt is otherwise overwhelming, a brief and oblique reference to a defendant's prior criminal history may constitute only harmless error. Thus, had we determined that Rossi's testimony was improperly admitted, we would find that error harmless.

Judgment of sentence affirmed.